HON. RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ARCH INSURANCE COMPANY,

    Plaintiff,

    v.

SCOTTSDALE INSURANCE COMPANY, a
foreign corporation; and NORTHWEST
TOWER CRANE, a Washington corporation,

    Defendants.

NO: C09-0602 RSM

DECLARATION OF MARK J. DYNAN IN
SUPPORT OF ARCH INSURANCE
COMPANY'S MEMORANDUM IN
RESPONSE TO SCOTTSDALE INSURANCE
COMPANY'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

Noted on Motion Calendar:
July 30, 2010

I, MARK J. DYNAN, do here by declare:

    1.    I am over the age of eighteen years and otherwise competent to testify herein. I am making these statements based on my personal knowledge. I am a member of the Washington State Bar and have been since October, 1981. I have tried to verdict over 100 jury trials in both State and Federal courts in addition to multiple varieties of arbitrations and administrative hearings as well. My background starts at the Attorney General's Office for the

LAW OFFICES
Gierke, Curwen, P.S.
TACOMA OFFICE
SUITE 400, BUILDING D
2102 NORTH PEARL STREET
TACOMA, WA 98406-2550
(253) 752-1600 / (253) 383-3761
TOLL FREE: (877) 797-1600
FACSIMILE: (253) 752-1666

SEATTLE OFFICE
WELLS FARGO CENTER
999 THIRD AVENUE
SUITE 2525
SEATTLE, WA 98104-4089
TOLL FREE: 877-797-1600
FACSIMILE: 253-752-1666

State of Washington, proceeds to a large firm in Tacoma – Eisenhower Carlson where I represented corporations such as Weyerhaeuser, Exxon, Asarco, and Dupont. These all involved multiple complicated litigation in which I was either lead attorney or second chair. After that time I worked in the area of insurance defense, doing multiple cases for State Farm, Allstate and other insurance companies including AIG and Arch. My current cases involve everything from a small auto accident to complex litigations such as the case of the crane failure.

2.      I have reviewed the declaration of Thomas Fitzpatrick along with Attachments A and B and the reports from Mr. Fitzpatrick and Mr. Talmadge. I am going to try to educate both the court and counsel as to the complexity of this case to help the court to understand the amount of fees and the reason for these fees. I will not go into the minutiae of one single bill but rather stay with the broader subjects raised by Mr. Fitzpatrick. Further, I do not have a numbered set of discovery documents, so I cannot decipher the referenced billing entries and am unable to respond to specific entries without more information. (I would note that the "Margaritaville" bill was probably an error as I do not recall going to Las Vegas in this case.)

3.      The best description of this case is found in Attachments A and B to this declaration which are the Statement of Facts utilized by Northwest Tower Crane's attorneys in Motions for Summary Judgment. As can be seen, there were multiple witnesses as well as multiple depositions during a one year period. In fact, while Northwest Tower Crane ("NWTC") says there were approximately 80, I believe the number was closer to 90. That began just after litigation was started and also involved dealing with the L&I issue which will be explained below. The number of parties involved at times ranged up to 22 named parties, depending upon

LAW OFFICES
Gierke, Curwen, P.S.

| TACOMA OFFICE | SEATTLE OFFICE |
|---|---|
| SUITE 400, BUILDING D | WELLS FARGO CENTER |
| 2102 NORTH PEARL STREET | 999 THIRD AVENUE |
| TACOMA, WA 98406-2550 | SUITE 2525 |
| (253) 752-1600 / (253) 383-3761 | SEATTLE, WA 98104-4089 |
| TOLL FREE: (877) 797-1600 | TOLL FREE: 877-797-1600 |
| FACSIMILE: (253) 752-1666 | FACSIMILE: 253-752-1666 |

DECLARATION OF MARK J. DYNAN IN
RESPONSE TO SCOTTSDALE MOTION FOR
SUMMARY JUDGMENT - 2

the number of subcontractors that were involved in this case at one time and how many attorneys represented each party. Most of the parties had more than one firm representing them. To date there have been 584 pleadings filed in the consolidated State matter.

4.      Shortly after the crane fell, Lease Crutcher Lewis ("LCL") first notified its own attorneys Groff Murphy, PLLC ("Groff Murphy") and they wisely chose to contact Stafford Frey Cooper ("Stafford Frey") immediately. Stafford Frey was hired by AIG's Complex Litigation Division pursuant to AIG's excess policy, which was likely to be triggered given the death of Mr. Ammon and the amount of property damage. The necessity of obtaining and preserving evidence immediately after the accident was crucial due to the core question of liability in this matter. Groff Murphy along with Stafford Frey immediately set about gathering experts as well as retaining evidence to avoid any spoliation complaints. Our firm was first notified of this work in early January of 2007, about two months after the accident. Even though the first complaint had yet to be filed, we were contacted at that time by Arch, which was on notice of potential claims against LCL, to defend LCL.

5.      Since I was coming into the case a might late, the agreement with Arch was that any experts that the client, through personal counsel or Stafford Frey, had already hired were going to continue to remain on the case with the ability to hire additional experts as needed. I immediately was in contact with personal counsel for the client as well as Stafford Frey attorneys to coordinate efforts. It was made clear to me by Arch that I was to work independent of those counsel since there appeared to be some concern by Arch about information flowing freely to them to keep track of this case and be able to adjust it properly. Therefore, I was requested to

<table>
<tr><td>DECLARATION OF MARK J. DYNAN IN<br>RESPONSE TO SCOTTSDALE MOTION FOR<br>SUMMARY JUDGMENT - 3</td><td>LAW OFFICES<br>Gierke, Curwen, P.S.<br><br>TACOMA OFFICE<br>SUITE 400, BUILDING D<br>2102 NORTH PEARL STREET<br>TACOMA, WA 98406-2550<br>(253) 752-1600 / (253) 383-3761<br>TOLL FREE: (877) 797-1600<br>FACSIMILE: (253) 752-1666</td><td>SEATTLE OFFICE<br>WELLS FARGO CENTER<br>999 THIRD AVENUE<br>SUITE 2525<br>SEATTLE, WA 98104-4089<br>TOLL FREE: 877-797-1600<br>FACSIMILE: 253-752-1666</td></tr>
</table>

attend all depositions and work in all areas as additional counsel for LCL to protect the client and have an independent view to report to Arch to ensure that the client was being properly represented.  I asked Mr. Groff to release Arch from its duty to defend on February 8, 2007, since Stafford Frey was doing the job.  He insisted on behalf of the client that Arch continue to defend LCL with Stafford Frey acting as lead counsel and my participation as part of the "team."  In response to my request, Mr. Groff reminded me of the duty of Arch to provide a defense.  One of the concerns was that the client's personal counsel was already indicating that LCL may have its own claim, independent of the claims of the other potential plaintiffs and that there appeared at times that personal counsel was working in the best interests of LCL's claim as opposed to the defense of the client from the other claims.  To help alleviate that potential conflict, I was asked to act as defense counsel only for the client.  In order to defend my client I needed to know every aspect of the case.  This included responding to coverage counsel's questions for facts.

     6.     The work pre-suit was an immediate attempt to settle this matter prior to litigation and keep costs down as much as possible.  While experts had been retained, including experts across the country regarding steel structures and engineering as well as just experts on crane operation, the parties were already gathering in an attempt to reach a settlement of the main claims that potentially could rise to as much as $25 million.  The original two or three meetings of potential responsible parties ("PRP") were going well until Scottsdale changed defense attorneys for NWTC.  Mr. Scheer was appointed counsel for NWTC.  He entered into a meeting (about the third or fourth of the PRP meetings that were being held) and was adamant that settlement was not something they would even consider and that this case should be taken to

DECLARATION OF MARK J. DYNAN IN
RESPONSE TO SCOTTSDALE MOTION FOR
SUMMARY JUDGMENT - 4

LAW OFFICES
Gierke, Curwen, P.S.

TACOMA OFFICE
SUITE 400, BUILDING D
2102 NORTH PEARL STREET
TACOMA, WA  98406-2550
(253) 752-1600 / (253) 383-3761
TOLL FREE: (877) 797-1600
FACSIMILE: (253) 752-1666

SEATTLE OFFICE
WELLS FARGO CENTER
999 THIRD AVENUE
SUITE 2525
SEATTLE, WA 98104-4089
TOLL FREE: 877-797-1600
FACSIMILE: 253-752-1666

trial.  It was later learned that Mr. Scheer sent a letter back to his client and Scottsdale indicating that he felt there was no liability on the part of NWTC and that they would easily get out in an early motion and thus recommending not settling this matter.  So Scottsdale was well aware that they were hindering efforts to settle the case early.  Other subcontractors, while having little or nothing to do with liability, were interested merely in paying some minimal amount to add to the pot to resolve this matter and all of the other attorneys were perplexed by Scottsdale's position in this matter.  Thus, for over a year we continued to try to negotiate amongst the PRPs, as well as with plaintiffs, in trying to establish some way to divvy up the liability issue within reason, as well as negotiate reasonable settlements with the plaintiffs.  These negotiations in my opinion fell apart primarily because of the obstinacy of  Scottsdale acting through Mr. Scheer.  It was unfortunate that this matter could not be resolved within the first year when clearly there were non-fault plaintiffs, such as the decedent and the building owners that surrounded the area.  This attempt to resolve the case early even included hiring a mediator to act as master over objections and evidence rulings to assist the parties in reaching some sort of resolution.  In the meanwhile, experts were required to test the metal and review all of the engineering documents to prepare for questions regarding liability.  Again, all of these attempts were an effort to resolve this matter short of litigation but were thwarted in main part by NWTC and Scottsdale's insured.

7.    At some point, approximately a year after the incident, the plaintiffs became tired of being unable to get a consensus of the possible defendants and thus the suits were filed beginning with the Ammon suit on or about October 4, 2007, or almost 11 months after the crane

DECLARATION OF MARK J. DYNAN IN
RESPONSE TO SCOTTSDALE MOTION FOR
SUMMARY JUDGMENT - 5

LAW OFFICES
Gierke, Curwen, P.S.

TACOMA OFFICE
SUITE 400, BUILDING D
2102 NORTH PEARL STREET
TACOMA, WA  98406-2550
(253) 752-1600 / (253) 383-3761
TOLL FREE: (877) 797-1600
FACSIMILE: (253) 752-1666

SEATTLE OFFICE
WELLS FARGO CENTER
999 THIRD AVENUE
SUITE 2525
SEATTLE, WA 98104-4089
TOLL FREE: 877-797-1600
FACSIMILE: 253-752-1666

1   collapse.  At that point, cross claims were prepared and further experts were acquired as well as

2   the need for more research into the area.

3       8.      After the crane incident, the Washington Department of Labor & Industries had

4   made a large public announcement that they were going to cite both LCL as well as MKA for

5   their parts in this failure.  If these citations had gone to hearing and been upheld, they had the

6   potential for allowing the plaintiffs to utilize that information to prove liability without

7   presenting any experts.  In order to avoid the presumption of liability by utilizing the

8   Department's Order, these citations were fought.  However, it should be noted that I took a

9   different tack than did MKA on how to handle that.  I, having been formally an Assistant

10  Attorney General for the Department of Labor & Industries, and having worked directly for the

11  Director of L&I in the past, knew the current Director and had open communications with him.

12  Working with the Department took an extensive amount of time as well as working with the

13  Assistant Attorney Generals involved in the MKA case.  MKA in the alternative decided to

14  appeal the case to the Board of Industrial Insurance Appeals immediately and requested hearings.

15  This allowed a year of free discovery by everyone since all of the same witnesses were called in

16  the L&I case as would be utilized in the State cases.  Not only were the L&I citations a danger to

17  my client but the MKA hearings provided extra information from witnesses that I may not

18  otherwise have been able to talk to without formal deposition.  Eventually I was able to reach a

19  resolution with the Department of Labor & Industries and we entered into an Order on

20  Agreement of Parties that basically came to an "Alford" plea.  This prevented the initial L&I

21  citations on LCL's part to be utilized in any further hearings.

LAW OFFICES
Gierke, Curwen, P.S.
DECLARATION OF MARK J. DYNAN IN
RESPONSE TO SCOTTSDALE MOTION FOR
SUMMARY JUDGMENT - 6

TACOMA OFFICE
SUITE 400, BUILDING D
2102 NORTH PEARL STREET
TACOMA, WA 98406-2550
(253) 752-1600 / (253) 383-3761
TOLL FREE: (877) 797-1600
FACSIMILE: (253) 752-1666

SEATTLE OFFICE
WELLS FARGO CENTER
999 THIRD AVENUE
SUITE 2525
SEATTLE, WA 98104-4089
TOLL FREE: 877-797-1600
FACSIMILE: 253-752-1666

9.      There is a question about payments to other firms and payment to Stafford Frey of approximately $60,000.  It should be noted that Stafford Frey was responsible for procuring the storage area immediately for the crane, which, if one thinks about it, is not an easy task to find storage for 200 feet of crane pieces.  Those payments were taken on by Stafford Frey with the expectation that they would be repaid by whichever insurance company was responsible.  As Arch is the primary insurer vis-à-vis AIG, it was decided that they were responsible and they had to pay Stafford Frey for those expenses.  There is also a question of Navigant's expenses.  Navigant has handled all e-discovery.  It had to be explained to Arch what e-discovery was and the importance in this case because of the numerous computers that held information in this matter.  Keep in mind that this is a large multi-million dollar project and each member of the contracting team, supervisors, project managers, engineers and designers had their own laptop as well as multiple servers devoted to the project.  Thus, Navigant had to go through all of those servers to protect all the e-discoverable material and sort it out.  Once all of that was explained, Arch was accepting of that bill.  As far as the Tsongas bill, it was requested by both Arch and AIG that due to the expense and potential for liability which could total over $25 million, that this case should be presented to a focus group to test out our trial theories.  Those focus groups were held on one day with multiple groups, both morning and afternoon sessions, which did prove to be a great benefit to the client in how to present the case to a jury.  At the time those bills were incurred, it was clear that this case was going to jury due mostly to the efforts of Scottsdale being obstinate in frustrating a settlement resolution.  The bills to Hillis Clark for mediation were agreed to by all of the parties with the disclosure agreement executed ahead of

DECLARATION OF MARK J. DYNAN IN
RESPONSE TO SCOTTSDALE MOTION FOR
SUMMARY JUDGMENT - 7

LAW OFFICES
Gierke, Curwen, P.S.

TACOMA OFFICE
SUITE 400, BUILDING D
2102 NORTH PEARL STREET
TACOMA, WA 98406-2550
(253) 752-1600 / (253) 383-3761
TOLL FREE: (877) 797-1600
FACSIMILE: (253) 752-1666

SEATTLE OFFICE
WELLS FARGO CENTER
999 THIRD AVENUE
SUITE 2525
SEATTLE, WA 98104-4089
TOLL FREE: 877-797-1600
FACSIMILE: 253-752-1666

time that they had also done work and retained counsel for LCL in other matters. All counsel were made aware of that and agreed to splitting those fees. I do not believe that Arch is seeking reimbursement for any fees other than the mediation fees as pointed out in the report. The check to Cozen O'Connor is the settlement check paid by Arch. The settlement to the Cozen firm, who represented one of the plaintiffs, was well over $1 million and thus it was decided to utilize the bulk of the Arch policy to pay that particular settlement. That was also a requirement in the settlement that this settlement be paid quicker than AIG was willing to pay or any of the other parties.

10.     The issue of emails has come up. This was a constant concern for me as I was required to keep in touch with the client, the company, as well as numerous other attorneys. In a case as complex as this, communication and coordination, as well as keeping track of what is going on to effectively represent your client, is mandatory. Often, if I did not respond to an email within a short time, I would get a second email requesting a response. Oftentimes, Mr. Groff would send me an email asking questions and, if I did not respond to it, he would have Bill Lewis send me an email within hours asking the same question. Therefore, it was important that every time I could, to stop, take the time to read whatever email was sent to me and then respond to that email, which depending upon the questions took time to respond to those questions. This meant interrupting whatever else I was doing and devoting my attention to the email for a period of time. In accord with billing guidelines I would bill my time at one-tenth of an hour. That was reasonable given the interruption, review, and determining a response. As was noted in the report, I was doing individual emails as Arch had a rule against block billing.

LAW OFFICES
Gierke, Curwen, P.S.

TACOMA OFFICE
SUITE 400, BUILDING D
2102 NORTH PEARL STREET
TACOMA, WA  98406-2550
(253) 752-1600 / (253) 383-3761
TOLL FREE: (877) 797-1600
FACSIMILE: (253) 752-1666

SEATTLE OFFICE
WELLS FARGO CENTER
999 THIRD AVENUE
SUITE 2525
SEATTLE, WA 98104-4089
TOLL FREE: 877-797-1600
FACSIMILE: 253-752-1666

Ms. Gold finally called me and said that she was unhappy with these email billings and then requested that I do a block billing. She further indicated to me that she thought that I would just sit at the end of the day and review all of my emails. I indicated to her that this was impossible to just look at emails at one time, but we complied with her request to block bill. It has been complained that I billed with too much precision, however it was required by billing guidelines. It was important to respond to those emails to answer questions about availability not only for meetings with other attorneys but meeting with the client that needed to be responded to. These emails not only included times for these meetings but also other issues and discussion of itineraries for those meetings. It should be noted that there were approximately 20,000 emails by the time this case went to trial. I am sure the court can appreciate from just the shear volume of these emails that it was time consuming, but all of this was of benefit to the client in coordinating the defense of the client.

11.     There was concern about a trip to Houston, Texas for a witness deposition. This witness was a former LCL employee who was on the premises at the time and needed representation and she was being deposed by the Department of Labor & Industries. This was a perpetuation deposition by the Department, which could later be used by any party later and required my presence with the witness prior to the deposition. Therefore, my personal travel to Houston to be present with my witness was deemed necessary and approved by the company ahead of time. There were two assistant attorney generals that traveled to Texas as well for that deposition as I recall and they were physically present at the deposition. I am not comfortable in

LAW OFFICES
Gierke, Curwen, P.S.

TACOMA OFFICE
SUITE 400, BUILDING D
2102 NORTH PEARL STREET
TACOMA, WA 98406-2550
(253) 752-1600 / (253) 383-3761
TOLL FREE: (877) 797-1600
FACSIMILE: (253) 752-1666

SEATTLE OFFICE
WELLS FARGO CENTER
999 THIRD AVENUE
SUITE 2525
SEATTLE, WA 98104-4089
TOLL FREE: 877-797-1600
FACSIMILE: 253-752-1666

my professional opinion in my 29 years of experience in handling witnesses to have my own witness deposed without me being personally present.

12.     There was also concern about my paralegal's charges.   A paralegal, when properly utilized as in this case because of the over 30,000 documents, the amount of electronic materials disclosed as well as the number of witnesses and scheduling, and the pleadings being filed, all of her work in coordinating and handling such efforts was necessary.  It should be pointed out that a lot of the pleadings were generated by Scottsdale's attorney for NWTC with multiple motions, in fact their motion for summary judgment to be dismissed was brought four separate times in this consolidated case before they finally won on the first day of trial.  That was just one of many motions filed by Scheer & Zehnder that helped increase the number of hours spent on this case.  Many of the motions, included sub-motions to file oversize briefs, etc., thus creating even more work.

13.     I would point out that any bill that I submitted to Arch under $25,000 was reviewed by Mr. Phillips.  I know that from my personal knowledge in that he would call me on occasion and ask me about something on each of those bills.  It was company policy that any bill over $25,000 would be reviewed by Marci Gold, who — as I described to her in one conversation — appeared to be the person you would think was the old guy with the green shades and the armband.  I am afraid she may have taken some offense to that comment, but she admitted that this was accurate and that was her role in the company.  She and I have worked together in resolving some of the billing issues.

LAW OFFICES
Gierke, Curwen, P.S.

TACOMA OFFICE
SUITE 400, BUILDING D
2102 NORTH PEARL STREET
TACOMA, WA 98406-2550
(253) 752-1600 / (253) 383-3761
TOLL FREE: (877) 797-1600
FACSIMILE: (253) 752-1666

SEATTLE OFFICE
WELLS FARGO CENTER
999 THIRD AVENUE
SUITE 2525
SEATTLE, WA 98104-4089
TOLL FREE: 877-797-1600
FACSIMILE: 253-752-1666

14.    Due to the number of witnesses, who took the deposition of which witness was divided up so only one attorney for LCL would be speaking per court rules. Since the case was so complex from multiple facts and legal issues, Stafford Frey and I used each other as backup to ensure everything was covered. At times my associate, Mr. Bowman, a new lawyer but with an Engineering Degree from West Point, would accompany me with prior approval of the company. This would be because he had better knowledge of parts of the case, but not my experience in the courtroom. I did travel from Tacoma where I live as was asked to work on this based upon my experience. We do not maintain staff in Seattle, but have an office for our use.

15.    My rates in this case were $175.00 and for the associate it was $165.00 and the paralegal rate was $90.00. These rates are more than reasonable compared to the other lawyers involved in the case. It is my understanding that Stafford Frey was charging $225 to $250 just for the associates they had working on this case, who had far less experience that I did, and Ms. Bremner and Mr. Buck were charging somewhere in the area of over $300 per hour. I did see some of Mr. Groff's billing and his time was billed at well over $300 per hour and I am sure that a review of the Scheer & Zehnder bills would bring to light their fees were much higher than mine. Therefore, if anything, my bills would be unreasonable because they were too light. However, that was the agreed-upon amount with the insurance company and one of the reasons that we are hired frequently by Arch is because we provide efficient service at a lower price.

LAW OFFICES
Gierke, Curwen, P.S.

| TACOMA OFFICE | SEATTLE OFFICE |
|---|---|
| SUITE 400, BUILDING D | WELLS FARGO CENTER |
| 2102 NORTH PEARL STREET | 999 THIRD AVENUE |
| TACOMA, WA 98406-2550 | SUITE 2525 |
| (253) 752-1600 / (253) 383-3761 | SEATTLE, WA 98104-4089 |
| TOLL FREE: (877) 797-1600 | TOLL FREE: 877-797-1600 |
| FACSIMILE: (253) 752-1666 | FACSIMILE: 253-752-1666 |

I declare under penalty of perjury that the foregoing is true and correct.

Dated this _2 6_ day of July, 2010.

MARK J. DYNAN, WSBA#12161
GIERKE CURWEN, P.S.
2102 North Pearl Street, Suite 400D
Tacoma, WA 98406
253-752-1600
mdynan@gcdjlaw.com

LAW OFFICES
Gierke, Curwen, P.S.

DECLARATION OF MARK J. DYNAN IN
RESPONSE TO SCOTTSDALE MOTION FOR
SUMMARY JUDGMENT - 12

| TACOMA OFFICE | SEATTLE OFFICE |
|---|---|
| SUITE 400, BUILDING D | WELLS FARGO CENTER |
| 2102 NORTH PEARL STREET | 999 THIRD AVENUE |
| TACOMA, WA  98406-2550 | SUITE 2525 |
| (253) 752-1600 / (253) 383-3761 | SEATTLE, WA 98104-4089 |
| TOLL FREE: (877) 797-1600 | TOLL FREE: 877-797-1600 |
| FACSIMILE: (253) 752-1666 | FACSIMILE: 253-752-1666 |

ATTACHMENT A

THE HONORABLE LAURA C. INVEEN
HEARING DATE: JULY 10, 2009
WITH ORAL ARGUMENT



IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

BRE PROPERTIES, INC.,

                                      Plaintiff,

v.

LEASE CRUTCHER LEWIS, LLC, et. al.

                               Defendants.

NO. 08-2-14232-9 SEA

NORTHWEST TOWER CRANE
SERVICE'S MOTION FOR SUMMARY
JUDGMENT DISMISSAL OF ALL
CLAIMS

## I.  INTRODUCTION

1.  **History of Bellevue Tower 333 Litigation: Four Consolidated Actions known as "In re Tower Crane"**

This lawsuit concerns the collapse of a construction tower crane in Bellevue, Washington on November 16, 2006. The tower crane was servicing the construction of a high-rise building called the Bellevue Tower 333 Project. The collapse caused the death of one individual and damage to a number of buildings and businesses.

Northwest Tower Crane (NWTC) is aware of six lawsuits regarding the tower crane collapse. In April and May of 2007, four of those lawsuits were filed by the Estate of Ammons (the individual who was killed), Brickman Civica, Intelligent Results, and Plaza

NORTHWEST TOWER CRANE SERVICE'S MOTION FOR
SUMMARY JUDGMENT DISMISSAL OF ALL CLAIMS – Page 1

65 009 fb234401

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

305 (various property owners and affected businesses). These four plaintiffs sued the general contractor, Lease Crutcher Lewis (LCL), and the structural engineer, Magnusson Klemencic Associates (MKA).   LCL brought five subcontractors into the suit via a third-party complaint: Bureau Veritas (BVNA); Caliper Inspections; Leibherr; Northwest Tower Crane (NWTC); and S&S Welding.   MKA named these five subcontractors and two others— Morrow Equipment Company and Ness Crane—as potential non-parties at fault.   In response, the four plaintiffs amended their Complaints to sue the seven subcontractors directly and moved to consolidate their four actions.  The cases were consolidated as IN RE TOWER CRANE COLLAPSE and assigned Cause No. 07-2-33136-1 SEA.  The Honorable Judge Trickey became the assigned individual calendar judge.

Those four plaintiffs diligently prosecuted their cases.  Approximately 40 experts and 40 lay witnesses were deposed.  Extensive discovery was completed and metallurgical testing performed.  Each of the seven subcontractors filed summary-judgment motions before the scheduled April 6, 2009 trial date.  All the subcontractors were eventually dismissed on the merits by Judge Trickey with prejudice.

The general contractor, LCL, and the structural engineer, MKA, were not dismissed. Consequently, LCL and MKA settled their claims with the first-party plaintiffs.  As a result, the only claims remaining in the IN RE TOWER CRANE COLLAPSE action are LCL's construction delay claims against MKA, which are being referred to as "affirmative" claims. Trial regarding LCL's affirmative claims against MKA has been temporarily postponed while LCL and MKA attempt to negotiate a settlement.

///

NORTHWEST TOWER CRANE SERVICE'S MOTION FOR
SUMMARY JUDGMENT DISMISSAL OF ALL CLAIMS -- Page 2

65 009 fb234401

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

2.     **History of BRE Properties and Travelers Insurance Lawsuits**

In addition to the four consolidated lawsuits, two additional lawsuits were filed by BRE Properties (property owner) and Travelers Insurance (subrogated interest regarding the cost of the damaged tower crane). BRE and Travelers both sued LCL, MKA, and a handful of subcontractors, including NWTC, directly. As it did in the IN RE TOWER CRANE COLLAPSE matter, LCL asserted claims against the subcontractors, including NWTC.

BRE and Travelers chose to not consolidate their actions with the IN RE TOWER CRANE COLLAPSE matter. Rather, Travelers moved to intervene in the BRE action and both took a wait-and-see approach. BRE and Travelers have done little to prosecute this matter. They have noted no depositions or conducted any formal discovery that NWTC is aware of. They rarely attended any of the IN RE TOWER CRANE COLLAPSE depositions. (Please Note: All deposition cited to in this motion were taken pursuant to the IN RE TOWER CRANE COLLAPSE matter.)

Subsequent to the dismissal of the seven subcontractors in the IN RE TOWER CRANE COLLAPSE matter, the subcontractors requested BRE similarly dismiss them from this action. However, BRE has refused to do so. Apparently, BRE is attempting to negotiate a settlement with LCL, but it has been months since NWTC has heard any news regarding this representation. NWTC and the other subcontractors should be dismissed form this lawsuit just as they were in the IN RE TOWER CRANE COLLAPSE matter over two months ago. It is improper for BRE to hold them captive while it negotiates settlement with the truly responsible parties (LCL and MKA) as the October 12, 2009 trial date approaches. (As discussed below, BRE failed to disclose any expert witnesses whatsoever on the May 11,

NORTHWEST TOWER CRANE SERVICE'S MOTION FOR
SUMMARY JUDGMENT DISMISSAL OF ALL CLAIMS – Page 3

65 009 fb234401

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

2009 Disclosure of Possible Primary Witnesses deadline.  And BRE's responses to NWTC's contention interrogatories merely state, "BRE incorporates the expert materials prepared by the experts for all plaintiffs in the consolidated crane case collapse litigation.")

To the contrary, Travelers apparently agrees the subcontractors should be dismissed and, to that end, Travelers filed a Proposed Order Granting Voluntary Dismissal with the court on April 24, 2009.  However, NWTC has not yet received a conformed copy.

## II.    RELIEF REQUESTED

**1.    Claim Preclusion: Dismissal of LCL's Claims against NWTC**

On May 4, 2009, Judge Trickey formalized his April 20, 2009 oral ruling and entered a final judgment on the merits dismissing all claims asserted by all parties against NWTC in the IN RE TOWER CRANE COLLAPSE matter with prejudice.  LCL was a party to that action and asserted the same claims against NWTC there then as it does here now. Therefore, the doctrines of claim preclusion and res judicata require this Court to similarly dismiss LCL's current claims against NWTC in this action with prejudice.

**2.    Claim Preclusion: Dismissal of BRE's Claims against NWTC**

Although BRE was not a party to the IN RE TOWER CRANE COLLAPSE matter, it has totally aligned its liability case here with that of the plaintiffs in that matter.  First, BRE failed to disclose any expert witnesses whatsoever on the May 11, 2009 Disclosure of Possible Primary Witnesses deadline.  Additionally, BRE's responses to NWTC's contention interrogatories merely stated that, "BRE incorporates the expert materials prepared by the experts for all plaintiffs in the consolidated crane case collapse litigation."  Because BRE has adopted the identical position in this case that the plaintiffs did in the IN RE TOWER

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200 F: (206) 223-4065

CRANE COLLAPSE matter, and because it has presented no new or additional experts or theories of liability, the doctrines of claim preclusion and res judicata require this Court to also dismiss BRE's claims against NWTC in this action with prejudice.

**3.     Dismissal of all BRE, Travelers, and LCL Claims: NWTC was Not a Cause or Proximate Cause of the Collapse**

In the IN RE TOWER CRANE COLLAPSE matter, Lease Crutcher Lewis (LCL) employees testified they have no complaints about the work performed by Northwest Tower Crane (NWTC), its crane-erection subcontractor. Magnusson Klemencic Associates (MKA) employees testified they have no complaints about the work performed by NWTC. The construction-management and construction-safety experts retained by plaintiffs in the IN RE TOWER CRANE COLLAPSE matter testified they have no complaints about the work performed by NWTC. No fact witness or qualified expert has testified that NWTC caused, or was the proximate cause, of the tower-crane collapse. BRE has failed to disclose any liability experts or lay witnesses. Therefore, BRE's claims against NWTC are merely premised upon the same attorney conjecture that was alleged in the IN RE TOWER CRANE COLLAPSE matter, which was not sufficient evidence to avoid summary-judgment dismissal there, nor is it sufficient to avoid summary judgment here.

**4.     LCL and MKA Solely Responsible—Miscommunication on Part of LCL and MKA resulted in Grossly Under-Designed Tower Crane Base**

LCL, the general contractor, hired MKA, a structural engineering firm, to design a non-traditional steel crane base to support the Project's tower crane. Due to a colossal miscommunication between the two regarding how to resist the tower crane's overturning moment, the steel crane base was designed to be much weaker than it needed to be, unless

NORTHWEST TOWER CRANE SERVICE'S MOTION FOR
SUMMARY JUDGMENT DISMISSAL OF ALL CLAIMS – Page 5

65 009 fb234401

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA  98101
P: (206) 262-1200  F: (206) 223-4065

1   the tower crane was simultaneously supported by a tie-in brace connecting the tower crane's

2   mast to the building structure about five-stories above the crane base.  No such tie in was

3   installed because of the miscommunication between LCL and MKA.   LCL and MKA

4   employees have testified NWTC had no involvement in these communications.

5          The cause of the collapse was a crack in the base that developed due to repetitive

6   cyclical loading.  The proximate cause of the collapse was the LCL-MKA miscommunication

7   that resulted in a crane base that was too weak to support the crane without simultaneous

8   support from a five-story tie-in to the crane mast.  There simply is no issue of material fact

9   linking NWTC to the cause or proximate cause of the collapse.  The collapse would have

10  occurred irrespective of the allegations against NWTC.  No reasonable jury would find

11  otherwise.

12

13         BRE's answers to NWTC's contention interrogatories state that its case against

14  NWTC is merely premised upon "the expert materials prepared by the experts for all

15  plaintiffs in the consolidated crane case collapse litigation."  Therefore, BRE has no evidence

16  that anything other than the LCL-MKA miscommunication caused the collapse.

17

18  5.     **NWTC Warned LCL to Have an Engineer Inspect the Base: MKA Failed to**
           **Properly Inspect**

19

20         On the day the crane was erected, the base made a strange "popping" noise.  NWTC

21  employees told LCL to have the crane base inspected by the engineer who designed it to

22  ensure it was manufactured and functioning as designed.   Although NWTC and LCL

23  concurred that the safest course of action was to finish erecting the crane so it would be

24  balanced, NWTC explicitly instructed LCL that the base had to be inspected by the designing

25  engineer as soon as possible.  NWTC employees are not engineers and had no knowledge of

26

NORTHWEST TOWER CRANE SERVICE'S MOTION FOR
SUMMARY JUDGMENT DISMISSAL OF ALL CLAIMS – Page 6

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA  98101
P: (206) 262-1200 F: (206) 223-4065

65 009 fb234401

how the crane base was designed or supposed to function.  The erection plans did not indicate a supporting tie-in was to be installed.  NWTC followed the plans.

LCL followed NWTC's warning and had MKA inspect the crane base two days later. However, MKA failed to notice that the supporting tie-in brace that it had anticipated would connect the crane mast to building structure was not present.  Incredibly, it failed to notice that the five-story building structure that was supposed to support the tie-in didn't even exist. LCL had failed to construct the five-story core of the building as MKA anticipated and MKA didn't even notice!  Clearly, NWTC was not the cause or proximate cause of the collapse and should be dismissed.  BRE has disclosed no experts or evidence to the contrary.

## III.    STATEMENT OF FACTS

### A.    Parties

Plaintiff BRE Properties has an interest in the Pinnacle Bell Center which was damaged when the subject tower crane collapsed on it on November 16, 2006.  It sues for repair costs, emergency action costs, and lost rent.

BRE failed to disclose any experts in its mandatory Disclosure of Possible Primary Witnesses, which was due on May 11, 2009.  (Exhibit 1 to Declaration of Mazhari: Plaintiff BRE Properties Disclosure of Possible Primary Witnesses).  It also failed to disclose any witness or liability experts in its answers to NWTC's expert interrogatories.  (Exhibit 2 to Declaration of Mazhari: BRE Properties' Answers and Responses to NWTC's Expert Interrogatories.)   Critically, in its answers to NWTC's contention interrogatories, it specifically adopted the contentions of the consolidated plaintiffs as follows:

BRE incorporates the expert materials prepared by the experts for all plaintiffs in the consolidated crane case collapse litigation.

NORTHWEST TOWER CRANE SERVICE'S MOTION FOR
SUMMARY JUDGMENT DISMISSAL OF ALL CLAIMS – Page 7

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

65 009 fb234401

(Exhibit 3 to Declaration of Mazhari: BRE Properties' Answers and Responses to NWTC's Contention Interrogatories at pg. 4 ln. 19-21.)  Other than simply parroting the plaintiffs' contentions in the IN RE TOWER CRANE COLLAPSE matter, BRE has disclosed no experts and has made no independent contentions to support its allegations against NWTC.

Likewise, neither Travelers Insurance nor LCL even bothered to file the mandatory Disclosure of Possible Primary Witnesses in this matter, which had a deadline of May 11, 2009.  Consequently, no party to this litigation has made any allegations that differ from those presented and ruled upon on the merits by Judge Trickey in the IN RE TOWER CRANE COLLAPSE matter.

LCL was the general contractor in control of the Tower 333 Project.  After LCL was sued by BRE, it asserted cross claims against the various subcontractors, including NWTC. MKA was the engineer of record and designer of the Tower 333 building.  It was separately engaged by LCL to design the steel base that supported the tower crane.

NWTC is a construction subcontractor that primarily specializes in erecting and dismantling tower cranes and manlifts.  (Weber Decl. at ¶ 3.)  NWTC was dismissed from the IN RE TOWER CRANE COLLAPSE matter by Judge Tricky with prejudice after a hearing on the merits.  (Exhibit 4 to Declaration of Mazhari: Order Granting NWTC's Motion for Reconsideration and Renewed Motion for Summary Judgment Dismissal.)

NWTC provides the labor necessary to assemble and dissemble tower cranes.  It does not design, manufacture, maintain, own, lease, and generally does not even transport the tower cranes it assembles.  It merely puts them up and takes them down pursuant to the plans provided by the hiring entity and the owner of the crane.  (Weber Decl. at ¶ 4.)

NORTHWEST TOWER CRANE SERVICE'S MOTION FOR
SUMMARY JUDGMENT DISMISSAL OF ALL CLAIMS – Page 8

65 009 fb234401

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA  98101
P: (206) 262-1200  F: (206) 223-4065

With respect to the Tower 333 project, NWTC was hired by LCL to erect and
disassemble the tower crane intended to service the project pursuant to the plans provided by
LCL and the crane owner, Morrow.  (Ex. 9 to Bendele Decl. (NWTC Subcontract) at p. 1, ¶
3.; Weber Decl. at ¶ 6-7.)  NWTC did not own, design, manufacture, lease, or maintain the
subject crane owned by Morrow.  The plans called for the tower crane to be erected onto a
custom steel base.  NWTC was not hired, and did not assist in the design, manufacture, or
maintenance of the steel base foundation designed by MKA.  It did not even know the
identity of MKA at the time.  (Weber Decl.)  NWTC was not hired, nor is it licensed, to
provide any engineering or other design services.  NWTC was not hired, nor is it licensed, to
provide any surveying services.   LCL had in-house surveying crews that performed the
survey measuring to ensure that the base was level and the tower mast was plumb.  LCL and
its design and manufacture professionals are responsible for the crane base.  NWTC is
responsible for assembling the crane on the base provided.  (Weber Decl.; McKenney Decl;
Harr Decl.; Phinizy Decl.)   LCL's Grant Willman testified that LCL is responsible for
providing NWTC with a crane base to assemble the crane onto and to make sure the base is
ready for NWTC.  NWTC's scope of work is to assemble the crane upon the base LCL
provides.   (Exhibit 1 to the Declaration of Levi Bendele ("Bendele Decl.") Deposition
Transcript of Grant Willman, hereinafter "Willman Dep.") at pp. 152-153:11-25 and 1-25.)

**B.    Design of Tower Crane Base for the Tower 333 Project**

**1.    LCL and MKA Decided to Use an Uncommon Steel Frame Base**

Generally tower cranes are erected upon concrete bases. Two previous attempts to
develop the Project had been started and failed such that several floors of an underground
garage and elevator core were present when the project began.  LCL determined that the

NORTHWEST TOWER CRANE SERVICE'S MOTION FOR
SUMMARY JUDGMENT DISMISSAL OF ALL CLAIMS – Page 9

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

65 009 fb234401

location of the previous concrete crane base would be insufficient for the work required on the new building plan, thus, a new location for the tower crane was needed. The new location was on top of the floors of the underground garage, which were too weak to support the weight of a traditional concrete base and a tower crane.

2.    **Miscommunication between LCL and MKA**

MKA and LCL had a brainstorming session on June 15, 2006. LCL's Grant Willman was present along with MKA's engineer Dough Loesch. They decided MKA would design an H-shaped steel crane base on the top deck of the existing parking structure which would be connected into the building's vertical support columns, which were strong enough to support the weight of the crane. This plan spared the expense of demolishing and replacing the parking structure.

A design idea called "Alternative F" was discussed at the June 15, 2006 meeting. (Ex. 2 to Bendele Decl. (Alternative F))   It called for the strength of the crane base to be supplemented by an initial tie-in brace between the crane mast and an adjacent structure, such as the building's concrete elevator core, approximately five stories above the crane base. The existence of the tie-in brace would eliminate the crane's "overturning moment" so the base itself did not have to.   Thus the base itself could be much weaker if a tie-in were utilized, than it would need to be without one. LCL alleges that the Alternative F design was rejected because the building core was not high enough to provide a tie-in position for the crane in its initial assembly position. (Ex. 1 to Bendele Decl. (Willman Dep.) at p. 62:1-25) At the same time, however, LCL's Grant Willman admits that had he been more clear in his memo confirming the June 15, 2006 meeting, perhaps the miscommunication would not have occurred. (Ex. 1 to Bendele Decl. (Willman Dep.) at pp. 158-159:16-24 and 1-14.)

MKA's Doug Loesch states that based on the June 15, 2006 design meeting and his communications with LCL, he believed the building core would be built up by LCL such that

NORTHWEST TOWER CRANE SERVICE'S MOTION FOR
SUMMARY JUDGMENT DISMISSAL OF ALL CLAIMS – Page 10

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA  98101
P: (206) 262-1200  F: (206) 223-4065

65 009 fb234401

1  Alternative F would be implemented when the crane was erected.  Therefore, he designed a

2  steel frame base assuming that the tower crane would exert no overturning moment on the

3  base due to the tie-in.  Id. at pp. 397-398:16-24 and 1-4.

4     Such a base could be designed to be weaker than a base that would not have the

5  benefit of supplemental support from a tie-in brace.  Mr. Loesch essentially contends that no

6  one at LCL informed him that the tie-in would not be implemented on the tower crane in its

7  initial assembly position.  Id. at pp. 302-303:23-25 and 1-2.  Consequently, MKA designed a

8  crane base that required the installation of an initial tie-in brace to properly support the

9  subject tower crane.

10    **3.**  **Erection Plans Indicated Crane was to be Freestanding and Without an**

11       **Initial Tie-In Brace**

12     LCL's Grant William testified that the plans provided to NWTC for the erection of the

13  crane, and the bid provided by NWTC to LCL, all indicated that that initial configuration of

14  the crane would be "free standing on foot anchor" and without the implementation of any tie-

15  in brace when erected.  (Ex. 1 to Bendele Decl. (Willman Dep.) pp. 148-151:14-25, 1-25, 1-

16  25, and 1-25.)  These were the plans distributed to NWTC by LCL and the crane's owner,

17  Morrow.  Id.  NWTC erected the crane according to the plans provided.  (Weber Decl. at ¶

18  4.)  NWTC had no idea an initial tie-in was contemplated by the engineer, it only knew what

19  the plans said.  If the plans had called for an initial tie in, a completly different assembly

20  procedure would have been required, a different bid would have been written, assembly

21  would have taken two days, and NWTC would have had to charge LCL more to do the job.

22  Id. at at ¶ 15.  And most glaringly, NWTC would have noticed that there was no five story

23  building core to attach the tie-in to.  Id.  LCL's Willman is not aware of anyone ever

24  providing NWTC with the Alternative F plans.  (Ex. 1 to Bendele Decl. (Willman Dep.) p.

25  151:11-13.)

26

NORTHWEST TOWER CRANE SERVICE'S MOTION FOR
SUMMARY JUDGMENT DISMISSAL OF ALL CLAIMS – Page 11

65 009 fb234401

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

**4.    LCL and MKA Employees Confirm NWTC Not Involved with Design**

LCL's Grant William testified that NWTC did not have anything to do with the design of the base or the construction of the base. (Ex. 1 to Bendele Decl. (Willman Dep.) p. 153:8-25.) MKA's Doug Loesch confirmed that NWTC was not involved in designing the crane base. (Ex. 3 to Bendele Decl. (Loesch Dep.) at p. 16:18-20.) Further, Mr. Loesch testified that he did not "have any criticism or complaint whatsoever about the work performed by [NWTC]." Id. at p. 15:11-15. Ms. Gretchen Humphrey also testified she had no criticism of NWTC. (Ex. 4 to Bendele Decl. (Humphrey Dep.) p. 279:9-14.)

**5.    Experts Testify that NWTC Not Involved or Responsible for Miscommunication between MKA and LCL**

Allan Hauck is the Department head of the Construction Management Department at California Polytechnic State University. He was jointly retained by the first-party plaintiffs in the IN RE TOWER CRANE COLLAPSE matter. He testified that he believes the MKA-LCL miscommunication caused the crane collapse. He further testified that, "I do not believe there was any contribution from NWTC to that misunderstanding" (the [MKA-LCL] miscommunication). (Ex. 5 to Bendele Decl. (Hauck Dep.) p. 80:4-14.) Expert Hauck further testified that he believed NWTC was not responsible for the crane collapse at the Bellevue Tower 333 Project. Id. at. 81:17-20.

The IN RE TOWER CRANE COLLAPSE matter Plaintiff's construction-safety expert Kurt Stranne did not have any opinion that NWTC violated any duties or standards of care. (Ex. 6 to Bendele Decl. (Stranne Dep.) p. 72:5-14.) Similarly, LCL's construction expert, John Putnam, did not have any opinion that NWTC violated and duties, standards of care, or contributed to the cause of the crane collapse. (Ex. 7 to Bendele Decl. (Putnam Dep.) pp. 154-155:17-25 and 1-2.)

///

///

NORTHWEST TOWER CRANE SERVICE'S MOTION FOR
SUMMARY JUDGMENT DISMISSAL OF ALL CLAIMS – Page 12

65 009 fb234401

C.   **NWTC's Pre-Crane-Erection Involvement in the Tower 333 Project**
   1.   **"Base Tower" used as Template for Steel Base Two Weeks before Day of Erection**

The "base tower" is the first mast section of the tower crane installed on the "crane base." The names "base tower" and "crane base" can be confusing. The subject base tower was manufactured by Liebherr, stands approximately 38 feet tall, and was painted yellow. It is separate and distinct from the steel base designed by MKA, which is shaped like an "H" and is reddish in color. (Weber Decl. at ¶ 8.)   The base tower was delivered to the job site while the MKA designed base was under construction to ensure the bolt-hole pattern of the base tower would properly match the bolt-hole pattern being constructed on the steel base.

   2.   **NWTC Was Not Responsible for the Crane Base**

NWTC had no involvement in the design, manufacture, or installation of the crane base. (Ex. 1 to Bendele Decl. (Willman Dep.) p. 153:3-25; Ex. 8 to Bendele Decl. (Kragseth Dep.) p. 157:8-20; Ex. 9 to Bendele Decl. (Akre Dep.) pp. 94-95:20-25 and 1-17; Ex. 10 to Bendele Decl. (Weber Dep.) p. 32:6-19.)   NWTC was not responsible to check the welding on the crane base foundation.   (Ex. 11 to Bendele Decl. (Hagwood Dep.) p. 146:21-25.) NWTC was not responsible for determining whether additional inspection or testing of the crane base was required after the tower was assembled.   (Ex. 8 to Bendele Decl. (Kragseth Dep.) p. 159:12-16.)   LCL was responsible for constructing the tower crane base frame, sequencing and coordinating the design, construction, and inspection of the base foundation. Id. at pp. 156-157:7-25 and 1-19.

   3.   **NWTC Had the Shims Manufactured based upon LCL's Measurements to Ensure its Base Tower was Level**

After the manufacture of the crane base was completed, LCL's on-site survey engineers measured or "shot the elevation" to make sure it was level.   (Ex. 11 to Bendele Decl. (Hagwood Dep.) p. 121:8-25; Ex. 8 to Bendele Decl. (Kragseth Dep.) p. 164:1-19.) The data from the LCL survey engineers was then used to determine out how thick of shims

NORTHWEST TOWER CRANE SERVICE'S MOTION FOR
SUMMARY JUDGMENT DISMISSAL OF ALL CLAIMS – Page 13

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

65 009 fb234401

1    were needed for the crane base.  (Ex. 8 to Bendele Decl. (Kragseth Dep.) p. 164:13-19.)  The

2    information was provided to NWTC who had the shims manufactured by a fabrication shop.

3    (Ex. 10 to Bendele Decl. (Weber Dep.) p. 47:3-24; Weber Decl. at ¶ 9.)

4        NWTC employee Eric McKenney installed the shims two days before the crane was

5    erected and adjusted them pursuant to the instruction of the LCL surveyors until the base

6    tower was plum.  (McKenney Decl.)  After NWTC installed the shims, the LCL surveyors

7    determined that the shims were plumb and looked "good."  (Ex. 8 to Bendele Decl. (Kragseth

8    Dep.) pp. 165-166:1-25 and 1-11.)  NWTC was not responsible for determining whether the

9    base tower was plumb.  Id. at p. 166:12-20.  NWTC does not employ surveyors or structural

10   engineers and was not responsible for taking measurements of the crane base.  (Ex. 11 to

11   Bendele Decl. (Hagwood Dep.) p. 140:23-25; Ex. 8 to Bendele Decl. (Kragseth Dep.) p.

12   157:12-20.)

13   **D.      Tower Crane Assembly on September 9, 2006**

14       **1.      Erection of the Mast of the Tower Crane**

15       The tower crane was assembled on Saturday, September 9, 2006.  The crane was

16   owned by Morrow.  Its representative, B.A. Phillips, was overseeing the erection process.

17   Morrow provides the plans and jib configurations and NWTC assembles the crane according

18   to the plans.  NWTC employees are union ironworkers.  They are not surveyors or engineers.

19

20   NWTC had no engineer on its crew or staff.  NWTC doesn't operate the crane.  (Weber

21   Decl.; Harr Decl.; Phinizy Decl.)

22       The NWTC crew divided into two groups.  One group worked on the ground to

23   unload the crane pieces from the delivery trucks and do preliminary assembly.  The other was

24   on the crane and attached the preassembled pieces to the crane as it was assembled.  (Harr

25   Decl.; Phinizy Decl.; Weber Decl.)  After the crane's mast was erected, but before the

26

NORTHWEST TOWER CRANE SERVICE'S MOTION FOR
SUMMARY JUDGMENT DISMISSAL OF ALL CLAIMS – Page 14

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA  98101
P: (206) 262-1200  F: (206) 223-4065

65 009 fb234401

counter jib was installed, LCL's surveying crew "shot" the tower again to ensure that it was plumb. (Ex. 12 to Bendele Decl. (Hagwood Dept. of L&I Transcript) pp. 566-568:2-25, 1-25, and 1-4.)

**2. Rotation of Counter-jib and Machine Deck Caused a Loud 'Popping" Noise to Occur at Crane Base**

Once the counter jib and machine deck were installed, the crane was rotated 180 degrees to allow the front jib to be raised into position and attached. While the crane was rotating a loud popping sound was heard at the base. LCL's Kyle Kragseth ordered the NWTC team to come down from the crane, and halt the assembly. (Ex. 8 to Bendele Decl. (Kragseth Dep.) p. 169:10-14.)

**3. Inspection of the Crane Base after Popping Noise**

LCL was the general contractor and was responsible for the safety of the entire job site. (Ex. 8 to Bendele Decl. (Kragseth Dep.) p. 169:18-25.) LCL's Jon Hagwood was in charge that day. Representatives from Morrow, LCL, and NWTC gathered around the crane base and visually inspected the base. (Ex. 11 to Bendele Decl. (Hagwood Dep.) pp. 130-131:5-25 and 1-17.) LCL Employee Craig Harr stated that the crane base was so "odd" that no one at LCL knew how it was going to react. (Ex. 13 to Bendele Decl. (Craig Harr Dep.) pp. 126-127:2-25 and 1-4.) Various workers looked at the steel base and saw slip joints, grout pads, and some cracked plywood that had been used to build a form for the pouring of the grout pad. (Ex. 11 to Bendele Decl. (Hagwood Dep.) pp. 130-131:5-25 and 1-17.) The welds appeared to be intact and did not appeared to have any defects when inspected by LCL's Craig Harr. (Jeff Harr Decl. at ¶ 9; Phinizy Decl. at ¶ 10; Ex. 13 to Bendele Decl. (Craig Harr Dep.) 127:2-4.)

///

///

NORTHWEST TOWER CRANE SERVICE'S MOTION FOR
SUMMARY JUDGMENT DISMISSAL OF ALL CLAIMS – Page 15

65 009 fb234401

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

4.    **LCL States That the Base was Stamped by and Engineer and Purposefully Designed to Deflect**

There was concern regarding whether the crane base was designed properly.  Dan Schaefer from NWTC spoke to who is assumed to be Jon Hagwood (a large African-American LCL superintendent).   Schaefer expressed concern that the crane base had deflected.   Another NWTC employee, Chad Peterson also expressed his opinion that something seemed amiss.  (Ex. 14 to Bendele Decl. (Schaefer Dep.) p. 35:1-25.)  Jon Hagwood told them the base was specifically designed to deflect.  Id. at p. 33:2-19.  He told Schaefer that, "We went to school for this and we know what were doing."  Schaefer felt Hagwood was implying they were stupid.  Id. at p. 35:18.24.   Hagwood told the NWTC employees that the base had been designed by the engineer to move and that it was functioning as designed. (Phinizy Decl. at ¶ 10-14; Ex. 14 to Bendele Decl. (Schaefer Dep.) p. 33:2-19.)

Another NWTC employee, William Phinizy, had a further conversation with a female LCL employee with blonde shoulder-length hair, about 5'6" tall, and average weight.  He does not recall her name or title, but she appeared to be some sort of a design professional.  He told her, as he had told Jon Hagwood, that he had concerns about the base deflection.  She told Mr. Phinizy that she gets paid $150,000 per year to design this stuff and that LCL knows what its doing. (Phinizy Decl. at ¶ 15.)

The Morrow representative, B.A. Phillips, was present at the base when Dan Schaefer demanded LCL have an engineer come look at the base before the crew re-ascended the crane.  (Ex. 15 to Bendele Decl. (Phillips Dep.) p. 60:14-21.)  A thin Caucasian man with a white hard hat, who Phillips assumed was an engineer, examined the base while they ate lunch.  Id. at 33-34:20-24.  After lunch LCL employee Craig Harr told them that "nothing was found to be wrong" and they went back to work.  Id. at 39-40:23-11.

///

NORTHWEST TOWER CRANE SERVICE'S MOTION FOR
SUMMARY JUDGMENT DISMISSAL OF ALL CLAIMS – Page 16

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA  98101
P: (206) 262-1200  F: (206) 323-4065

65 009 fb234401

5.   **LCL Surveyors Measure Crane Base After Popping Noise**

LCL surveyors measured the crane base after the popping noise. NWTC employee Gator Rasmussen assisted the LCL surveyors by holding a ruler in place as instructed. LCL assistant superintendent Craig Harr observed the process and states there was an elevation difference of one inch from beam to beam. (Ex. 13 to Bendele Decl. (Craig Harr Dep.) p. 54:1-7.) Craig Harr knew MKA had engineered the base but did not attempt to call its engineers on a Saturday. He felt this task was Jon Hagwood's responsibility and left it to Hagwood to call MKA. Id. at 118:12-20. LCL's Jon Hagwood did call MKA and testified that he did not expect NWTC employees, workers who were not structural engineers, to verify that MKA had designed the crane base properly. (Ex. 11 to Bendele Decl. (Hagwood Dep.) p. 141:5-9.)

6.   **LCL's Hagwood Speaks with NWTC's Dave Weber: LCL Instructed to have Crane Base Inspected by Engineer**

NWTC employees Jeff Harr and Dan Schaefer called NWTC president Dave Weber, to advise him of what happened. Mr. Weber asked who was present, what had been found, and what had been decided. LCL's Jon Hagwood and NWTC's Dave Weber then spoke on the phone. (Ex. 11 to Bendele Decl. (Hagwood Dep.) pp. 131-132:24-25 and 1-24.; Weber Decl.) Hagwood confirmed the base had been designed by an engineer. They agreed that the crane was in a precarious position because it was very unbalanced. Attaching the front jib to the crane would serve to balance out the crane. Dave Weber told Jon Hagwood that he should call the engineers to inspect the base. (Weber Decl.)

7.   **Jon Hagwood Made the Decision to Finish Assembly to Balance Crane and Called MKA to Investigate**

Jon Hagwood gave the orders to continue assembly of the crane, because with the weight of the counter-jib pushing the crane to lean to one side, the crane was in its most

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

vulnerable position of falling down at that point.  (Ex. 13 to Bendele Decl. (Craig Harr Dep.) p. 114:9-24; Ex. 8 to Bendele Decl. (Kragseth Dep.) pp. 174-175:4-25 and 1-14; Ex. 11 to Bendele Decl. (Hagwood Dep.) pp. 133:6-17.)  Dave Weber did not have authority over the Project, and it was Jon Hagwood who supervised the crane assembly process at that point. (Ex. 13 to Bendele Decl. (Craig Harr Dep.) pp. 116-117:16-25 and 1-20.)  Additionally, Dave Weber made no representation about whether the base was adequate before or after the popping noise. (Ex. 13 to Bendele Decl. (Craig Harr Dep.) p. 118:6-11.)

That same day, immediately after the crane was assembled, Jon Hagwood called Gretchen Humphrey, an MKA assistant structural engineer who was working with Doug Loesch on the crane design team to discuss the loud "pop" which emanated from the crane base. (Ex. 4 to Bendele Decl. (Humphrey Dep.) p. 261:6-13.)  Mr. Hagwood requested that someone from MKA come and inspect the crane base the following week.  (Ex. 8 to Bendele Decl. (Kragseth Dep.) p. 177:6-25.)

E.    **Activity After Tower Crane Assembly**

1.    **MKA's Visual Inspection of the Crane Base After the Popping Noise**

At the request of LCL, MKA's Doug Loesch visually inspected the base the following week when he came to visit the site. (Ex. 8 to Bendele Decl. (Kragseth Dep.) p. 177:6-25.) Mr. Loesch never took any measurements of the base to see if the base comported with the calculated deflections.  (Ex. 3 to Bendele Decl. (Loesch Dep.) p. 281:12-18.)  Also, LCL did not conduct a comprehensive crane-base inspection. (Ex. 8 to Bendele Decl. (Kragseth Dep.) pp. 176-179:20-25, 1-25, 1-25, and 1-8.)  MKA's Gretchen Humphrey told Kyle Kragseth that the base appeared normal and told LCL to repair the areas around the crane base where the grout had been broken on the day of assembly.  Id.  Incredibly, Mr. Loesch did not notice that there was no "Alternative F" tie-in to the crane and that there was no five-story building

NORTHWEST TOWER CRANE SERVICE'S MOTION FOR
SUMMARY JUDGMENT DISMISSAL OF ALL CLAIMS – Page 18

65 009 fb234401

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA  98101
P: (206) 262-1200  F: (206) 223-4065

1   core to which the tie-in could be attached. (Ex. 3 to Bendele Decl. (Loesch Dep.) pp. 212-
2   214:16-25, 1-25, and 1-16.)

3       **2.     Morrow's Load Testing and Certification of the Crane**

4           Morrow conducted a load test two days after the crane was erected. (Ex. 13 to
5   Bendele Decl. (Craig Harr Dep.), pp. 104:19-21.)   NWTC's duties were simply to attach
6   weights to the hook of the crane as directed by Morrow's technician. (Ex. 7 to Bendele Decl.
7   (Putnam Dep.) pp. 155-156:3-25 and 1-10.)   Morrow and LCL certified the crane for
8   operation.  B.A. Phillips signed for Morrow and Craig Harr signed for LCL.  (Ex. 13 to
9   Bendele Decl. (Craig Harr Dep.) pp. 104-105:22-25 and 1-9.; Exhibit 15 to Bendele Decl.
10  (Morrow Crane Equipment Certificate))  Craig Harr understood the Certificate to mean that
11  the load test had been performed to a specific standard with a Morrow technician on-site
12  performing the test. (Ex. 13 to Bendele Decl. (Craig Harr Dep.) p. 105:14-17.)  He also read
13  and understood the purpose of the Certification before he signed it and stated he would have
14  asked Jon Hagwood for clarification if he didn't.  Id. at p. 105-106:18-25 and 1-8.

15          Paragraph 3 of the Certification applies to stationary cranes.  It requires the lessee's
16  representative to confirm that foundations were adequately installed and base section leveled.
17  B.A. Phillips indicated that LCL was the lessee. (Ex. 16 to Bendele Decl. (Phillips Dep.), pp.
18  85-86:2-25 and 1-2.)  Even though the base was made of steel rather than concrete, Mr.
19  Phillips indicates LCL still needed confirm it was adequately installed and level. Id.

20      **3.     Crane Usage for Nine Weeks**

21          After the day of assembly, Jon Hagwood never followed up with NWTC regarding
22  MKA's investigation of the foundation base after the loud popping noise because there was
23  no concern with the crane base and thus nothing to report. (Ex. 11 to Bendele Decl.
24  (Hagwood Dep.), pp. 137:2-21).  If MKA had told Mr. Hagwood that NWTC needed to do
25  some additional work or modification to the crane because of the condition of the steel
26

NORTHWEST TOWER CRANE SERVICE'S MOTION FOR
SUMMARY JUDGMENT DISMISSAL OF ALL CLAIMS – Page 19

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

65 009 fb234401

foundation, Mr. Hagwood would have told NWTC to do it. Id at p. 138:7-12. Mr. Hagwood did not call NWTC to come back and do any work or modification to the crane after speaking with MKA about their visual inspection. Id. at p. 138:13-22. After the crane was assembled, NWTC left the site, and had no responsibility to measure the base or conduct testing. Id. at p. 147:11-18. The crane was used for nine weeks before collapsing.

4.    **LCL Employees Testify NWTC did Nothing Wrong and Did Not Violate its Contractual Duties**

LCL's Senior Project Superintendent Jon Hagwood testified that he had no complaints with the work performed by NWTC. Id. at p. 147:19-24. He stated, "I have a lot of respect for Weber and his crew. I think they are professionals in the industry. I've worked with them for years and think they are true professionals." Jon Hagwood's replacement, Scott Akre, testified that he was not aware of any manner in which NWTC's work did not comply with its contract. (Ex. 9 to Bendele Decl. (Akre Dep.), p. 92-93:9-25 and 1-22.) He further explained that if NWTC's work did not comply with its contract, he would have notified NWTC in a writing that identified any non-conforming issues. This did not occur. Id.

IV.    **ISSUES PRESENTED**

(1)    Should this Court dismiss all LCL claims against NWTC pursuant to the doctrines of claims preclusion and res judicata because: (a) LCL was a party to the IN RE TOWER CRANE COLLAPSE matter and asserted the same claims against NWTC there then as it does here now; and (b) Judge Trickey entered a final judgment on the merits dismissing all claims asserted by all parties, including LCL, against NWTC in the IN RE TOWER CRANE COLLAPSE matter with prejudice?

(2)    Should this Court dismiss all BRE claims against NWTC pursuant to the doctrines of claims preclusion and res judicata because: (a) BRE's answers to NWTC's

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

contention interrogatories merely "incorporates the expert materials prepared by the experts for all plaintiffs in the consolidated crane collapse litigation"; (b) BRE has disclosed no new or additional experts or theories of liability; and (c) Judge Trickey entered a final judgment on the merits dismissing all claims asserted by all parties against NWTC in the IN RE TOWER CRANE COLLAPSE matter with prejudice?

(3)   Should the court dismiss all claims against NWTC because BRE, Travelers, and LCL have failed to provide evidence or testimony that shows NWTC was a cause or proximate cause of the tower crane collapse?

## V.   **EVIDENCE RELIED UPON**

The pleadings and files herein.  The Declaration of Levi Bendele with the following Exhibits:

| | |
|---|---|
| **Exhibit 1:** | Deposition Transcript of Grant Willman (LCL) |
| **Exhibit 2:** | Alternative "F" Plans |
| **Exhibit 3:** | Deposition Transcript of Doug Loesch (MKA) |
| **Exhibit 4:** | Deposition Transcript of Gretchen Humphrey (MKA) |
| **Exhibit 5:** | Deposition Transcript of Allan Hauck (Four Plaintiffs) |
| **Exhibit 6:** | Deposition Transcript of Kurt Stranne (Four Plaintiffs) |
| **Exhibit 7:** | Deposition Transcript of John Putnam (LCL) |
| **Exhibit 8:** | Deposition Transcript of Kyle Kragseth (LCL) |
| **Exhibit 9:** | Deposition Transcript of Scott Akre (LCL) |
| **Exhibit 10:** | Deposition Transcript of Dave Weber (NWTC) |
| **Exhibit 11:** | Deposition Transcript of Jonathon Hagwood (LCL) |
| **Exhibit 12:** | Deposition Transcript of Jonathon Hagwood from Department of L & I (LCL) |
| **Exhibit 13:** | Deposition Transcript of Craig Harr (LCL) |
| **Exhibit 14:** | Deposition Transcript of Dan Schaefer (NWTC) |

NORTHWEST TOWER CRANE SERVICE'S MOTION FOR
SUMMARY JUDGMENT DISMISSAL OF ALL CLAIMS – Page 21

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

65 009 fb234401

| | | |
|---|---|---|
| **Exhibit 15:** | Morrow Equipment Crane Certificate (including readable Exemplar) |
| **Exhibit 16:** | Deposition Transcript of Buford Phillips |

And the Declaration of Afshin Mazhari with the following Exhibits:

| | | |
|---|---|---|
| **Exhibit 1:** | Plaintiff BRE Properties Disclosure of Possible Primary Witnesses |
| **Exhibit 2:** | BRE Properties' Answers and Responses to NWTC's Expert Interrogatories |
| **Exhibit 3:** | BRE Properties' Answers and Responses to NWTC's Contention Interrogatories at pg. 4 ln. 19-21 |
| **Exhibit 4:** | Order Granting NWTC's Motion for Reconsideration and Renewed Motion for Summary Judgment Dismissal |
| **Exhibit 5:** | Declaration of David Weber (originally filed in IN RE TOWER CRANE COLLAPSE matter). |
| **Exhibit 6:** | Declaration of Eric Mc Kenney (originally filed in IN RE TOWER CRANE COLLAPSE matter). |
| **Exhibit 7:** | Declaration of William Phinizy (originally filed in IN RE TOWER CRANE COLLAPSE matter). |
| **Exhibit 8:** | Declaration of Jeff Harr (originally filed in IN RE TOWER CRANE COLLAPSE matter). |

## VI.   ARGUMENT AND AUTHORITY

**A.   Claim Preclusion regarding LCL's Claims in BRE Matter**

The doctrine of claim preclusion, which is also known as res judicata, is designed to prevent the relitigation of a claim or cause of action. It has been said that for the doctrine to apply, there must be substantial identity in the successive proceedings.   Since 1918, Washington courts have applied the doctrine as follows:

> To make a judgment res judicata in a subsequent action there must be a concurrence of identity in four respects: (1) Of subject-matter; (2) of cause of action; (3) of persons and parties; and (4) in the quality of the persons for or against whom the claim is made.

Northern Pac. Ry. Co. v. Snohomish County, 101 Wn. 686, 688, 172 P. 878, 879 (1918).

NORTHWEST TOWER CRANE SERVICE'S MOTION FOR
SUMMARY JUDGMENT DISMISSAL OF ALL CLAIMS – Page 22

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

65 009 fb234401

TOWER CRANE COLLAPSE matter Plaintiffs' construction-management expert (Hauck) and construction-safety expert (Stranne) have no issues with the work NWTC performed. LCL's construction expert Putnam has no issues with the work NWTC performed.

Neither BRE, Travelers, or LCL disclosed a crane expert to testify regarding the standard of care applicable to a tower-crane erection company in this matter. This is highly irregular in a lawsuit involving the collapse of a crane where a crane-erection company has been sued. Perhaps they did speak to consulting crane experts, but decided against disclosing any such experts when they were told NWTC did nothing wrong?

This Court has given BRE, Travelers, and LCL more than enough time to develop material facts that show NWTC caused or contributed to the collapse. None have been developed or disclosed. Summary judgment dismissal is proper and justice requires NWTC, its employees, and their families not be put through the expense and emotional toll of a 4-6 week trial.

### VIII.  Proposed Order

A proposed form of Order is attached for the Court's reference.

DATED this     day of June, 2009.

SCHEER and ZEHNDER LLP

By _____
Mark P. Scheer, WSBA No. 16651
mscheer@scheerlaw.com
Levi Bendele, WSBA No. 26411
lbendele@scheerlaw.com
Afshin Mazhari, WSBA No. _____
amazhari@scheerlaw.com
Attorneys for Northwest Tower Crane Service, Inc.

NORTHWEST TOWER CRANE SERVICE'S MOTION FOR
SUMMARY JUDGMENT DISMISSAL OF ALL CLAIMS -- Page 31

6S 009 fb234401

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

ATTACHMENT B

THE HONORABLE MICHAEL J. TRICKEY



IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

IN RE

TOWER CRANE COLLAPSE,

NO. 07-2-33136-1 SEA

07-2-32215-9SEA
07-2-33136-1SEA
07-2-38868-1SEA
07-2-39334-0SEA

NORTHWEST TOWER CRANE
SERVICES'S MOTION FOR
SUMMARY JUDGMENT

## I.   RELIEF REQUESTED

**1.   NWTC was Not a Cause or Proximate Cause of the Collapse**

Lease Crutcher Lewis (LCL) employees have testified they have no complaints about the work performed by Northwest Tower Crane (NWTC), its crane-erection subcontractor. Magnusson Klemencic Associates (MKA) employees have testified they have no complaints about the work performed by NWTC. Plaintiffs' construction-management and construction-safety experts have testified they have no complaints about the work performed by NWTC. No fact witness or qualified expert has testified that NWTC caused, or was the proximate

NORTHWEST TOWER CRANE SERVICE'S MOTION
FOR SUMMARY JUDGMENT – Page 1

65 003 fb234401

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200 F: (206) 223-4065

1  cause, of the tower-crane collapse. The claims against NWTC are merely premised upon

2  attorney conjecture, which is not evidence sufficient to avoid summary-judgment dismissal.

3  **2. LCL and MKA Solely Responsible—Miscommunication on Part of LCL and**
4  **MKA resulted in Grossly Under-Designed Tower Crane Base**

5  LCL, the general contractor, hired MKA, a structural engineering firm, to design a

6  non-traditional steel crane base to support the Project's tower crane. Due to a colossal

7  miscommunication between the two regarding how to resist the tower crane's overturning

8  moment, the steel crane base was designed to be much weaker than it needed to be, unless

9  the tower crane was simultaneously supported by a tie-in brace connecting the tower crane's

10  mast to the building structure about five-stories above the crane base. No such tie in was

11  installed because of the miscommunication between LCL and MKA. LCL and MKA

12

13  employees have testified NWTC had no involvement in these communications.

14  The cause of the collapse was a crack in the base that developed due to repetitive

15  cyclical loading. The proximate cause of the collapse was the LCL-MKA miscommunication

16  that resulted in a crane base that was too weak to support the crane without simultaneous

17  support from a five-story tie-in to the crane mast. There simply is no issue of material fact

18  linking NWTC to the cause or proximate cause of the collapse. The collapse would have

19  occurred irrespective of the allegations against NWTC. No reasonable jury would find

20

21  otherwise.

22  **3. NWTC Warned LCL to Have Engineer Inspect the Base: MKA Failed to**
23  **Properly Inspect**

24  On the day the crane was erected, the base made a strange "popping" noise. NWTC

25  employees told LCL to have the crane base inspected by the engineer who designed it to

26

NORTHWEST TOWER CRANE SERVICE'S MOTION
FOR SUMMARY JUDGMENT – Page 2

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

65 003 fb234401

ensure it was manufactured and functioning as designed.   Although NWTC and LCL concurred that the safest course of action was to finish erecting the crane so it would be balanced, NWTC explicitly instructed LCL that the base had to be inspected by the designing engineer as soon as possible.  NWTC employees are not engineers and had no knowledge of how the crane base was designed or supposed to function.  The erection plans did not indicate a supporting tie-in was to be installed.  NWTC followed the plans.

LCL followed NWTC's warning and had MKA inspect the crane base two days later. However, MKA failed to notice that the supporting tie-in brace that it had it anticipated would connect the crane mast to building structure was not present.  Incredibly, it failed to notice that five-story building structure that was supposed to support the tie-in didn't even exist. LCL had failed to construct the five-story core of the building as MKA anticipated and MKA didn't even notice!   Clearly, NWTC was not the cause or proximate cause of the collapse and should be dismissed.

## II.   STATEMENT OF FACTS

A.   **Parties**

Matthew Ammon was at home in his apartment when the tower crane collapsed and crushed him. Plaza 305 is a low-rise office building adjacent to the Tower 333 Project on the south.   Intelligent Results was a tenant of the Plaza 305 building.   Brickman Civica (Brickman) is the owner of the Civica Building which is located directly south of the Plaza 305 building.   LCL was the general contractor in control of the Tower 333 Project.  After LCL was sued by the four consolidated plaintiffs, it asserted third-party claims against five third-party defendants: BVNA; NWTC; Caliber Inspection; S&S Welding; and Liebherr.

NORTHWEST TOWER CRANE SERVICE'S MOTION
FOR SUMMARY JUDGMENT – Page 3

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA  98101
P: (206) 262-1200  F: (206) 223-4065

68 003 fb234401

1    MKA was the engineer of record and designer of the Tower 333 building.  It was separately

2    engaged by LCL to design the steel base that supported the tower crane.  After MKA was

3    sued by the four consolidated plaintiffs, MKA asserted affirmative defenses that identified

4    seven potential at-fault entities that included the five subcontractors sued by LCL plus

5    Morrow Equipment Company and Ness Crane.

6

7        NWTC was not originally sued by the consolidated plaintiffs.  The first-party

8    plaintiffs subsequently sued NWTC (and the other third-parties) to prevent the possibility of

9    empty chairs at trial.  NWTC is a construction subcontractor that primarily specializes in

10   erecting and dismantling tower cranes and manlifts.  (Weber Decl. at ¶ 3.)   It provides the

11   labor necessary to assemble and dissemble.  It does not design, manufacture, maintain, own,

12   lease, and generally does not even transport the tower cranes it assembles.  It merely puts

13   them up and takes them down pursuant to the plans provided by the hiring entity and the

14   owner of the crane.  Id. at ¶ 4.

15

16       With respect to the Tower 333 project, NWTC was hired by LCL to erect and

17   dissemble the tower crane intended to service the project pursuant to the plans provided by

18   LCL and the crane owner, Morrow.  (Ex. 9 to Bendele Decl. (NWTC Subcontract) at p. 1, ¶

19   3.; Weber Decl. at ¶ 6-7.)  NWTC did not own, design, manufacture, lease, or maintain the

20   subject crane owned by Morrow.  The plans called for the tower crane to be erected onto a

21   custom steel base.  NWTC was not hired, and did not assist in the design, manufacture, or

22   maintenance of the steel base foundation designed by MKA.  It did not even know the

23   identity of MKA at the time.  (Weber Decl.)  NWTC was not hired, nor is it licensed, to

24   provide any engineering or other design services.  NWTC was not hired, nor is it licensed, to

25

26

NORTHWEST TOWER CRANE SERVICE'S MOTION
FOR SUMMARY JUDGMENT – Page 4

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA  98101
P: (206) 262-1200  F: (206) 223-4065

65 003 fb234401

provide any surveying services.   LCL had in-house surveying crews that performed the survey measuring to ensure that the base was level and the tower mast was plumb.  LCL and its design and manufacture professionals are responsible for the crane base.  NWTC is responsible for assembling the crane on the base provided.  (Weber Decl.; McKenney Decl; Harr Decl.; Phinizy Decl.)  LCL's Grant Willman testified that LCL is responsible for providing NWTC with a crane base to assemble the crane onto and to make sure the base is ready for NWTC.  NWTC's scope of work is to assemble the crane upon the base LCL provides.   (Exhibit 1 to the Declaration of Levi Bendele ("Bendele Decl.") (Deposition Transcript of Grant Willman, hereinafter "Willman Dep.") at pp. 152-153:11-25 and 1-25.)

**B.    Design of Tower Crane Base for the Tower 333 Project**

   **1.    LCL and MKA Decide to Use an Uncommon Steel Frame Base**

   Generally tower cranes are erected upon concrete bases. Two previous attempts to develop the Project had been started and failed such that several floors of an underground garage and elevator core were present when the project began.  LCL determined that the location of the previous concrete crane base would be insufficient for the work required on the new building plan, thus, a new location for the tower crane was needed.  The new location was on top of the floors of the underground garage, which were too weak to support the weight of a traditional concrete base and a tower crane.

   **2.    Miscommunication between LCL and MKA**

   MKA and LCL had a brainstorming session on June 15, 2006. LCL's Grant Willman was present along with MKA's engineer Dough Loesch.  They decided MKA would design an H-shaped steel crane base on the top deck of the existing parking structure which would be connected into the building's vertical support columns, which were strong enough to

NORTHWEST TOWER CRANE SERVICE'S MOTION
FOR SUMMARY JUDGMENT – Page 5

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

65 003 fb234401

1   support the weight of the crane.  This plan spared the expense of demolishing and replacing

2   the parking structure.

3       A design idea called "Alternative F" was discussed at the June 15, 2006 meeting.

4   (Ex. 2 to Bendele Decl. (Alternative F))    It called for the strength of the crane base to be

5   supplemented by an initial tie-in brace between the crane mast and an adjacent structure,

6   such as the building's concrete elevator core, approximately five stories above the crane base.

7   The existence of the tie-in brace would eliminate the crane's "overturning moment" so the

8   base itself did not have to.  Thus the base itself could be much weaker if a tie-in were

9   utilized, than it would need to be without one.  LCL alleges that the Alternative F design was

10  rejected because the building core was not high enough to provide a tie-in position for the

11  crane in its initial assembly position.  (Ex. 1 to Bendele Decl. (Willman Dep.) at p. 62:1-25)

12  At the same time, however, LCL's Grant Willman admits that had he been more clear in his

13  memo confirming the June 15, 2006 meeting, perhaps the miscommunication would not have

14  occurred.  (Ex. 1 to Bendele Decl. (Willman Dep.) at pp. 158-159:16-24 and 1-14.)

15      MKA's Doug Loesch states that based on the June 15, 2006 design meeting and his

16  communications with LCL, he believed the building core would be built up by LCL such that

17  Alternative F would be implemented when the crane was erected.  Therefore, he designed a

18  steel frame base assuming that the tower crane would exert no overturning moment on the

19  base due to the tie-in.  Id. at pp. 397-398:16-24 and 1-4.

20      Such a base could be designed to be weaker than a base that would not have the

21  benefit of supplemental support from a tie-in brace.  Mr. Loesch essentially contends that no

22  one at LCL informed him that the tie-in would not be implemented on the tower crane in its

23  initial assembly position.  Id. at pp. 302-303:23-25 and 1-2.  Consequently, MKA designed a

24  crane base that required the installation of an initial tie-in brace to properly support the

25  subject tower crane.

26

NORTHWEST TOWER CRANE SERVICE'S MOTION
FOR SUMMARY JUDGMENT – Page 6

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA  98101
P: (206) 262-1200  F: (206) 223-4065

65 003 fb234401

3.   **Erection Plans Indicated Crane was to be Freestanding and Without an Initial Tie-In Brace**

LCL's Grant William testified that the plans provided to NWTC for the erection of the crane, and the bid provided by NWTC to LCL, all indicated that that initial configuration of the crane would be "free standing on foot anchor" and without the implementation of any tie-in brace when erected. (Ex. 1 to Bendele Decl. (Willman Dep.) pp. 148-151:14-25, 1-25, 1-25, and 1-25.) These were the plans distributed to NWTC by LCL and the crane's owner, Morrow.  Id.  NWTC erected the crane according to the plans provided. (Weber Decl. at ¶ 4.) NWTC had no idea an initial tie-in was contemplated by the engineer, it only knew what the plans said.  If the plans had called for an initial tie in, a completed different assembly procedure would have been required, a different bid would have been written, assembly would have taken two days, and NWTC would have had to charge LCL more to do the job. Id. at at ¶ 15.  And most glaringly, NWTC would have noticed that there was no five story building core to attach the tie-in to.  Id.  LCL's Willman is not aware of anyone ever providing NWTC with the Alternative F plans.   (Ex. 1 to Bendele Decl. (Willman Dep.) p. 151:11-13.)

4.   **LCL and MKA Employees Confirm NWTC Not Involved with Design**

LCL's Grant William testified that NWTC did not have anything to do with the design of the base or the construction of the base. (Ex. 1 to Bendele Decl. (Willman Dep.) p. 153:8-25.) MKA's Doug Loesch confirmed that NWTC was not involved in designing the crane base. (Ex. 3 to Bendele Decl. (Loesch Dep.) at p. 16:18-20.) Further, Mr. Loesch testified that he did not "have any criticism or complaint whatsoever about the work performed by [NWTC]."  Id. at p. 15:11-15.  Ms. Gretchen Humphrey also testified she had no criticism of NWTC. (Ex. 4 to Bendele Decl. (Humphrey Dep.) p. 279:9-14.)

///

NORTHWEST TOWER CRANE SERVICE'S MOTION
FOR SUMMARY JUDGMENT – Page 7

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

65 003 fb234401

5.    **Experts Testify that NWTC Not Involved or Responsible for Miscommunication between MKA and LCL**

Plaintiffs' expert Allan Hauck is the Department head of the Construction Management Department at California Polytechnic State University. He was jointly retained by the first-party plaintiffs. He testified that he believes the MKA-LCL miscommunication caused the crane collapse. He further testified that, "I do not believe there was any contribution from NWTC to that misunderstanding" (the [MKA-LCL] miscommunication). (Ex. 5 to Bendele Decl. (Hauck Dep.) p. 80:4-14.) Expert Hauck further testified that he believed NWTC was not responsible for the crane collapse at the Bellevue Tower 333 Project. Id. at. 81:17-20.

Plaintiff's construction-safety expert Kurt Stranne did not have any opinion that NWTC violated any duties or standards of care. (Ex. 6 to Bendele Decl. (Stranne Dep.) p. 72:5-14.) Similarly, LCL's construction expert, John Putnam, did not have any opinion that NWTC violated and duties, standards of care, or contributed to the cause of the crane collapse. (Ex. 7 to Bendele Decl. (Putnam Dep.) pp. 154-155:17-25 and 1-2.)

C.    **NWTC's Pre-Crane-Erection Involvement in the Tower 333 Project**

1.    **"Base Tower" used as Template for Steel Base Two Weeks before Day of Erection**

The "base tower" is the first mast section of the tower crane installed on the "crane base." The names "base tower" and "crane base" can be confusing. The subject base tower was manufactured by Liebherr, stands approximately 38 feet tall, and was painted yellow. It is separate and distinct from the steel base designed by MKA, which is shaped like an "H" and is reddish in color. (Weber Decl. at ¶ 8.)   The base tower was delivered to the job site while the MKA designed base was under construction to ensure the bolt hole pattern of the base tower would properly match the bolt hole pattern being constructed on the steel base.

///

NORTHWEST TOWER CRANE SERVICE'S MOTION
FOR SUMMARY JUDGMENT – Page 8

65 003 fb234401

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

2.    **NWTC Was Not Responsible for the Crane Base**

NWTC had no involvement in the design, manufacture, or installation of the crane base. (Ex. 1 to Bendele Decl. (Willman Dep.) p. 153:3-25; Ex. 8 to Bendele Decl. (Kragseth Dep.) p. 157:8-20; Ex. 9 to Bendele Decl. (Akre Dep.) pp. 94-95:20-25 and 1-17; Ex. 10 to Bendele Decl. (Weber Dep.) p. 32:6-19.)   NWTC was not responsible to check the welding on the crane base foundation.  (Ex. 11 to Bendele Decl. (Hagwood Dep.) p. 146:21-25.) NWTC was not responsible for determining whether additional inspection or testing of the crane base was required after the tower was assembled.  (Ex. 8 to Bendele Decl. (Kragseth Dep.) p. 159:12-16.)   LCL was responsible for constructing the tower crane base frame, sequencing and coordinating the design, construction, and inspection of the base foundation. Id. at pp. 156-157:7-25 and 1-19.

3.    **NWTC Had the Shims Manufactured based upon LCL's Measurements
to Ensure its Base Tower was Level**

After the manufacture of the crane base was completed, LCL's on-site survey engineers measured or "shot the elevation" to make sure it was level.  (Ex. 11 to Bendele Decl. (Hagwood Dep.) p. 121:8-25; Ex. 8 to Bendele Decl. (Kragseth Dep.) p. 164:1-19.) The data from the LCL survey engineers was then used to determine out how thick of shims were needed for the crane base. (Ex. 8 to Bendele Decl. (Kragseth Dep.) p. 164:13-19.) The information was provided to NWTC who had the shims manufactured by a fabrication shop. (Ex. 10 to Bendele Decl. (Weber Dep.) p. 47:3-24; Weber Decl. at ¶ 9.)

NWTC employee Eric McKenney installed the shims two days before the crane was erected and adjusted them pursuant to the instruction of the LCL surveyors until the base tower was plum.  (McKenney Decl.)  After NWTC installed the shims, the LCL surveyors determined that the shims were plumb and looked "good." (Ex. 8 to Bendele Decl. (Kragseth Dep.) pp. 165-166:1-25 and 1-11.)  NWTC was not responsible for determining whether the base tower was plumb. Id. at p. 166:12-20. NWTC does not employ surveyors or structural

NORTHWEST TOWER CRANE SERVICE'S MOTION
FOR SUMMARY JUDGMENT – Page 9

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

engineers and was not responsible for taking measurements of the crane base.  (Ex. 11 to Bendele Decl. (Hagwood Dep.) p. 140:23-25; Ex. 8 to Bendele Decl. (Kragseth Dep.) p. 157:12-20.)

**D.    Tower Crane Assembly on September 9, 2006**

    **1.    Erection of the Mast of the Tower Crane**

The tower crane was assembled on Saturday, September 9, 2006.  The crane was owned by Morrow and its representative, B.A. Phillips, was overseeing the erection process. Morrow provides the plans and jib configurations and NWTC assembles the crane according to the plans.  NWTC employees are union ironworkers.  They are not surveyors or engineers. NWTC had no engineer on its crew or staff.  NWTC doesn't operate the crane.  (Weber Decl.; Harr Decl.; Phinizy Decl.)

The NWTC crew divided into two groups.  One group worked on the ground to unload the crane pieces from the delivery trucks and do preliminary assembly.  The other was on the crane and attached the preassembled pieces to the crane as it was assembled.  (Harr Decl.; Phinizy Decl.; Weber Decl.)  After the crane's mast was erected, but before the counter jib was installed, LCL's surveying crew "shot" the tower again to ensure that it was plumb.  (Ex. 12 to Bendele Decl. (Hagwood Dept. of L&I Transcript) pp. 566-568:2-25, 1-25, and 1-4.)

    **2.    Rotation of Counter-jib and Machine Deck Caused a Loud 'Popping" Noise to Occur at Crane Base**

Once the counter jib and machine deck were installed, the crane was rotated 180 degrees to allow the front jib to be raised into position and attached.  While the crane was rotating a loud popping sound was heard at the base.  LCL's Kyle Kragseth ordered the

NORTHWEST TOWER CRANE SERVICE'S MOTION
FOR SUMMARY JUDGMENT – Page 10

65 003 fb234401

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200 F: (206) 223-4065

NWTC team to come down from the crane, and halt the assembly. (Ex. 8 to Bendele Decl. (Kragseth Dep.) p. 169:10-14.)

### 3.   Inspection of the Crane Base after Popping Noise

LCL was the general contractor and was responsible for the safety of the entire job site. (Ex. 8 to Bendele Decl. (Kragseth Dep.) p. 169:18-25.)  LCL's Jon Hagwood was in charge that day.  Representatives from Morrow, LCL, and NWTC gathered around the crane base and visually inspected the base. (Ex. 11 to Bendele Decl. (Hagwood Dep.) pp. 130-131:5-25 and 1-17.) LCL Employee Craig Harr stated that the crane base was so "odd" that no one at LCL knew how it was going to react. (Ex. 13 to Bendele Decl. (Craig Harr Dep.) pp. 126-127:2-25 and 1-4.)  Various workers looked at the steel base and saw slip joints, grout pads, and some cracked plywood that had been used to build a form for the pouring of the grout pad.  (Ex. 11 to Bendele Decl. (Hagwood Dep.) pp. 130-131:5-25 and 1-17.)  The welds appeared to be intact and did not appeared to have any defects when inspected by LCL's Craig Harr.  (Jeff Harr Decl. at ¶ 9; Phinizy Decl. at ¶ 10; Ex. 13 to Bendele Decl. (Craig Harr Dep.) 127:2-4.)

### 4.   LCL States That the Base was Stamped by and Engineer and Purposefully Designed to Deflect

There was concern regarding whether the crane base was designed properly.  Dan Schaefer from NWTC spoke to who is assumed to be Jon Hagwood (a large African-American LCL superintendent).   Schaefer expressed concern that the crane base had deflected.   Another NWTC employee, Chad Peterson also expressed his opinion that something seemed amiss.  (Ex. 14 to Bendele Decl. (Schaefer Dep.) p. 35:1-25.)  Jon Hagwood told them the base was specifically designed to deflect. Id. at p. 33:2-19. He told Schaefer that, "We went to school for this and we know what were doing." Schaefer felt Hagwood was implying they were stupid. Id. at p. 35:18.24.   Hagwood told the NWTC employees that the base had been designed by the engineer to move and that it was

NORTHWEST TOWER CRANE SERVICE'S MOTION
FOR SUMMARY JUDGMENT – Page 11

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200 F: (206) 223-4065

65 003 fb234401

1    functioning as designed.  (Phinizy Decl. at ¶ 10-14; Ex. 14 to Bendele Decl. (Schaefer Dep.)

2    p. 33:2-19.)

3        Another NWTC employee, William Phinizy, had a further conversation with a female

4    LCL employee with blonde shoulder-length hair, about 5'6" tall, and average weight.  He

5    does not recall her name or title, but she appeared to be some sort of a design professional.

6    He told her, as he had told Jon Hagwood, that he had concerns about the base deflection.  She

7    told Mr. Phinizy that she gets paid $150,000 per year to design this stuff and that LCL knows

8    what its doing.  (Phinizy Decl. at ¶ 15.)

9        The Morrow representative, B.A. Phillips, was present at the base when Dan Schaefer

10   demanded LCL have an engineer come look at the base before the crew re-ascended the

11   crane.  (Ex. 15 to Bendele Decl. (Phillips Dep.) p. 60:14-21.)  A thin Caucasian man with a

12   white hard hat, who Phillips assumed was an engineer, examined the base while they ate

13   lunch.  Id. at 33-34:20-24.  After lunch LCL employee Craig Harr told them that "nothing

14   was found to be wrong" and they went back to work.  Id. at 39-40:23-11.

15       5.    **LCL Surveyors Measure Crane Base After Popping Noise**

16       LCL surveyors measured the crane base after the popping noise.  NWTC employee

17   Gator Rasmussen assisted the LCL surveyors by holding a ruler in place as instructed.  LCL

18   assistant superintendent Craig Harr observed the process and states there was an elevation

19   difference of one inch from beam to beam.  (Ex. 13 to Bendele Decl. (Craig Harr Dep.) p.

20   54:1-7.)  Craig Harr knew MKA had engineered the base but did not attempt to call its

21   engineers on a Saturday.  He felt this task was Jon Hagwood's responsibility and left it to

22   Hagwood to call MKA.  Id. at 118:12-20.  LCL's Jon Hagwood did call MKA and testified

23   that he did not expect NWTC employees, workers who were not structural engineers, to

24   verify that MKA had designed the crane base properly.  (Ex. 11 to Bendele Decl. (Hagwood

25   Dep.) p. 141:5-9.)

26

NORTHWEST TOWER CRANE SERVICE'S MOTION
FOR SUMMARY JUDGMENT – Page 12

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

65 003 fb234401

6.    **LCL's Hagwood Speaks with NWTC's Dave Weber: LCL Instructed to have Crane Base Inspected by Engineer**

NWTC employees Jeff Harr and Dan Schaefer called NWTC president Dave Weber, to advise him of what happened. Mr. Weber asked who was present, what had been found, and what had been decided. LCL's Jon Hagwood and NWTC's Dave Weber then spoke on the phone. (Ex. 11 to Bendele Decl. (Hagwood Dep.) pp. 131-132:24-25 and 1-24.; Weber Decl.) Hagwood confirmed the base had been designed by an engineer. They agreed that the crane was in a precarious position because it was very unbalanced. Attaching the front jib to the crane would serve to balance out the crane. Dave Weber told Jon Hagwood that he should call the engineers to inspect the base. (Weber Decl.)

7.    **Jon Hagwood Made the Decision to Finish Assembly to Balance Crane and Called MKA to Investigate**

Jon Hagwood gave the orders to continue assembly of the crane, because with the weight of the counter-jib pushing the crane to lean to one side, the crane was in its most vulnerable position of falling down at that point. (Ex. 13 to Bendele Decl. (Craig Harr Dep.) p. 114:9-24; Ex. 8 to Bendele Decl. (Kragseth Dep.) pp. 174-175:4-25 and 1-14; Ex. 11 to Bendele Decl. (Hagwood Dep.) pp. 133:6-17.) Dave Weber did not have authority over the Project, and it was Jon Hagwood who supervised the crane assembly process at that point. (Ex. 13 to Bendele Decl. (Craig Harr Dep.) pp. 116-117:16-25 and 1-20.) Additionally, Dave Weber made no representation about whether the base was adequate before or after the popping noise. (Ex. 13 to Bendele Decl. (Craig Harr Dep.) p. 118:6-11.)

That same day, immediately after the crane was assembled, Jon Hagwood called Gretchen Humphrey, an MKA assistant structural engineer who was working with Doug Loesch on the crane design team to discuss the loud "pop" which emanated from the crane base. (Ex. 4 to Bendele Decl. (Humphrey Dep.) p. 261:6-13.) Mr. Hagwood requested that

NORTHWEST TOWER CRANE SERVICE'S MOTION
FOR SUMMARY JUDGMENT – Page 13

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

65 003 fb234401

someone from MKA come and inspect the crane base the following week.  (Ex. 8 to Bendele

Decl. (Kragseth Dep.) p. 177:6-25.)

**E.    Activity After Tower Crane Assembly**

    **1.    MKA's Visual Inspection of the Crane Base After the Popping Noise**

At the request of LCL, MKA's Doug Loesch visually inspected the base the following

week when he came to visit the site.  (Ex. 8 to Bendele Decl. (Kragseth Dep.) p. 177:6-25.)

Mr. Loesch never took any measurements of the base to see if the base comported with the

calculated deflections.  (Ex. 3 to Bendele Decl. (Loesch Dep.) p. 281:12-18.)  Also, LCL did

not conduct a comprehensive crane-base inspection.  (Ex. 8 to Bendele Decl. (Kragseth Dep.)

pp. 176-179:20-25, 1-25, 1-25, and 1-8.)  MKA's Gretchen Humphrey told Kyle Kragseth

that the base appeared normal and told LCL to repair the areas around the crane base where

the grout had been broken on the day of assembly.  Id.  Incredibly, Mr. Loesch did not notice

that there was no "Alternative F" tie-in to the crane and that there was no five-story building

core to which the tie-in could be attached.  (Ex. 3 to Bendele Decl. (Loesch Dep.) pp. 212-

214:16-25, 1-25, and 1-16.)

    **2.    Morrow's Load Testing and Certification of the Crane**

Morrow conducted a load test two days after the crane was erected.  (Ex. 13 to

Bendele Decl. (Craig Harr Dep.), pp. 104:19-21.)  NWTC's duties were simply to attach

weights to the hook of the crane as directed by Morrow's technician.  (Ex. 7 to Bendele Decl.

(Putnam Dep.) pp. 155-156:3-25 and 1-10.)  Morrow and LCL certified the crane for

operation.  B.A. Phillips signed for Morrow and Craig Harr signed for LCL.  (Ex. 13 to

Bendele Decl. (Craig Harr Dep.) pp. 104-105:22-25 and 1-9.; Exhibit 15 to Bendele Decl.

(Morrow Crane Equipment Certificate))  Craig Harr understood the Certificate to mean that

the load test had been performed to a specific standard with a Morrow technician on-site

performing the test.  (Ex. 13 to Bendele Decl. (Craig Harr Dep.) p. 105:14-17.)  He also read

NORTHWEST TOWER CRANE SERVICE'S MOTION
FOR SUMMARY JUDGMENT – Page 14

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA  98101
P: (206) 262-1200  F: (206) 223-4065

65 003 fb234401

1    and understood the purpose of the Certification before he signed it and stated he would have

2    asked Jon Hagwood for clarification if he didn't. Id. at p. 105-106:18-25 and 1-8.

3          Paragraph 3 of the Certification applies to stationary cranes. It requires the lessee's

4    representative to confirm that foundations were adequately installed and base section leveled.

5    B.A. Phillips indicated that LCL was the lessee. (Ex. 16 to Bendele Decl. (Phillips Dep.), pp.

6    85-86:2-25 and 1-2.) Even though the base was made of steel rather than concrete, Mr.

7    Phillips indicates LCL still needed confirm it was adequately installed and level. Id.

8          **3.    Crane Usage for Nine Weeks**

9          After the day of assembly, Jon Hagwood never followed up with NWTC regarding

10   MKA's investigation of the foundation base after the loud popping noise because there was

11   no concern with the crane base and thus nothing to report. (Ex. 11 to Bendele Decl.

12   (Hagwood Dep.), pp. 137:2-21). If MKA had told Mr. Hagwood that NWTC needed to do

13   some additional work or modification to the crane because of the condition of the steel

14   foundation, Mr. Hagwood would have told NWTC to do it. Id at p. 138:7-12. Mr. Hagwood

15   did not call NWTC to come back and do any work or modification to the crane after speaking

16   with MKA about their visual inspection. Id. at p. 138:13-22. After the crane was assembled,

17   NWTC left the site, and had no responsibility to measure the base or conduct testing. Id. at

18   p. 147:11-18. The crane was used for nine weeks before collapsing.

19         **4.    LCL Employees Testify NWTC did Nothing Wrong and Did Not Violate
             its Contractual Duties**
20

21         LCL's Senior Project Superintendent Jon Hagwood testified that he had no complaints

22   with the work performed by NWTC. Id. at p. 147:19-24. He stated, "I have a lot of respect

23   for Weber and his crew. I think they are professionals in the industry. I've worked with them

24   for years and think they are true professionals." Jon Hagwood's replacement, Scott Akre,

25   testified that he was not aware of any manner in which NWTC's work did not comply with

26   its contract. (Ex. 9 to Bendele Decl. (Akre Dep.), p. 92-93:9-25 and 1-22.) He further

NORTHWEST TOWER CRANE SERVICE'S MOTION
FOR SUMMARY JUDGMENT – Page 15

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

explained that if NWTC's work did not comply with its contract, he would have notified NWTC in a writing that identified any non-conforming issues. This did not occur. Id.

### III.   ISSUES PRESENTED

Should the court dismiss all claims against NWTC because plaintiffs have failed to provide evidence or testimony that shows NWTC was a cause or proximate cause of the tower crane collapse?

### IV.   EVIDENCE RELIED UPON

The Declarations of David Weber, Jeff Harr, William Phinizy, Eric McKenney, and the Declaration of Levi Bendele with the following Exhibits:

| | |
|---|---|
| **Exhibit 1:** | Deposition Transcript of Grant Willman (LCL) |
| **Exhibit 2:** | Alternative "F" Plans |
| **Exhibit 3:** | Deposition Transcript of Doug Loesch (MKA) |
| **Exhibit 4:** | Deposition Transcript of Gretchen Humphrey (MKA) |
| **Exhibit 5:** | Deposition Transcript of Allan Hauck (Four Plaintiffs) |
| **Exhibit 6:** | Deposition Transcript of Kurt Stranne (Four Plaintiffs) |
| **Exhibit 7:** | Deposition Transcript of John Putnam (LCL) |
| **Exhibit 8:** | Deposition Transcript of Kyle Kragseth (LCL) |
| **Exhibit 9:** | Deposition Transcript of Scott Akre (LCL) |
| **Exhibit 10:** | Deposition Transcript of Dave Weber (NWTC) |
| **Exhibit 11:** | Deposition Transcript of Jonathon Hagwood (LCL) |
| **Exhibit 12:** | Deposition Transcript of Jonathon Hagwood from Department of L & I (LCL) |
| **Exhibit 13:** | Deposition Transcript of Craig Harr (LCL) |
| **Exhibit 14:** | Deposition Transcript of Dan Schaefer (NWTC) |
| **Exhibit 15:** | Morrow Equipment Crane Certificate (including readable Exemplar) |
| **Exhibit 16:** | Deposition Transcript of Buford Phillips |

NORTHWEST TOWER CRANE SERVICE'S MOTION
FOR SUMMARY JUDGMENT – Page 16

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

65 003 fb234401

them have any issues with the work NWTC performed.  MKA employees Loesch and Humphrey both testified they have no issues with the work NWTC performed.  Plaintiffs' construction-management expert (Hauck) and construction-safety expert (Stranne) have no issues with the work NWTC performed.  LCL's construction expert Putnam has no issues with the work NWTC performed.

Neither LCL, MKA, nor the Plaintiffs retained a crane expert to testify regarding the standard of care applicable to a tower-crane erection company.  (LCL did disclose a rebuttal expert.)  This is highly irregular in a $20+ million lawsuit involving the collapse of a crane where a crane-erection company has been sued.  Perhaps they did speak to consulting crane experts, but decided against disclosing any such experts when they were told NWTC did nothing wrong?

This Court has given LCL, MKA, and the Plaintiffs more than enough time to develop material facts that show NWTC caused or contributed to the collapse.  None have been uncovered.  Summary judgment dismissal is proper and justice requires NWTC, its employees, and their families not be put through the expense and emotional toll of a 4-6 week liability trial.

DATED this 23rd day of February, 2009.

SCHEER and ZEHNDER LLP

By _____
Mark P. Scheer, WSBA No. 16651
mscheer@scheerlaw.com
Levi Bendele, WSBA No.
lbendele@scheerlaw.com
Jared A. Brickey, WSBA No. 40443
jbrickey@scheerlaw.com
Attorneys for Northwest Tower Crane Service, Inc.

NORTHWEST TOWER CRANE SERVICE'S MOTION
FOR SUMMARY JUDGMENT – Page 25

SCHEER & ZEHNDER LLP
701 PIKE STREET, SUITE 2200
SEATTLE, WA 98101
P: (206) 262-1200  F: (206) 223-4065

65 003 fb234401